# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| C.G., a minor, by and through her<br>next friend and mother, NICOLE GEORGAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:25-cv-13406 |
| | ) | |
| v. | ) | Judge: Rebecca Pallmeyer |
| | ) | |
| DEERFIELD PUBLIC SCHOOLS DISTRICT 109,<br>JOANNA FORD, in her official capacity as Assistant<br>Superintendent for Student Services for Deerfield Public<br>Schools District 109, and in her personal capacity, and<br>CATHY VAN TREESE, in her official capacity as<br>Associate Principal of Alan B. Shepard Middle School,<br>and in her personal capacity, | )<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S MOTION FOR
## TEMPORARY RESTRAINING ORDER AND
## PRELIMINARY INJUNCTION

In this action, Plaintiff C.G., a minor, by and through her next friend and mother, Nicole

Georgas (Georgas), is proceeding against Defendants Deerfield Public Schools District 109 (the

School District), Joanna Ford (Ford), in her official capacity as Assistant Superintendent for

Student Services for the School District and in her personal capacity, and Cathy Van Treese (Van

Treese), in her official capacity as Associate Principal of Alan B. Shepard Middle School (the

School) and in her personal capacity. (ECF 1, Compl.).

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff now moves this Court for a

Temporary Restraining Order (TRO) and Preliminary Injunction to enjoin Defendants from

enforcing their policy of allowing biological male students access to girls' locker rooms and other

female-only intimate spaces at the School based solely on those male students' self-declared

preferences, instead of offering such male students available single-occupancy gender-neutral facilities as a less-intrusive alternative.

Defendants' policy and actions violate the Fourteenth Amendment's guarantee of equal protection, constitute sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688 (Title IX), and infringe C.G.'s First Amendment right to free speech by threatening discipline for "misgendering" and coercing her silence and compliance.

C.G. suffered and continues to suffer severe anxiety, humiliation, nightmares, and ongoing psychological harm after being forced in February 2025 to undress in the presence of a male student while Defendants Ford, Van Treese, and other staff watched to ensure compliance. As a direct result, C.G. was withdrawn from the School effective October 14, 2025, and is now being homeschooled. (Compl. ¶¶ 1–9; C.G. Decl. (attached hereto as Ex. 1) ¶¶ 4–11; Georgas Decl. (attached hereto as Ex. 2) ¶¶ 3–12). Plaintiff seeks immediate injunctive relief to prevent Defendants from enforcing this unconstitutional and discriminatory policy, so that she may safely return to in-person education at her neighborhood public school.

Plaintiff is substantially likely to prevail on the merits on all three counts: violation of her Fourteenth Amendment right to equal protection (Count I), violation of Title IX (Count II), and violation of her First Amendment right to free speech (Count III). (Compl. ¶¶ 52–80).

C.G. will suffer irreparable injury if Defendants are not enjoined, as she remains effectively excluded from her public school and continues to endure lasting trauma. The prospect of this harm is ongoing and immediate so long as the policy remains in force. On the other hand, Defendants will not be injured at all if a TRO or Preliminary Injunction issues. Finally, the public interest favors enjoining Defendants.

2

## I. INTRODUCTION

This is not a case involving "transgender" students—students suffering from gender dysphoria who have or seek to "transition" to the gender opposite that of their biological sex. *Compare A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 764–65 (7th Cir. 2023) (allowing teenage biological girls, who had "socially transitioned" to living as boys, access to the boys' restrooms).

The male student at issue here had not "provided ample evidence of [his] medical diagnoses and the care [he] received from professionals to assist in [his] transition," nor "demonstrated that [his] gender identit[y] [was] enduring," such as by "legal name changes and gender-marker changes." *Id.* To the contrary, at the time he was granted access to the girls' locker room in February 2025, the male student was dressed as a male, spoke as a male, and appeared as a male both inside and outside the locker room. (Compl. ¶ 2; C.G. Decl. ¶ 3; Georgas Decl. ¶ 4). Indeed, this is a case in which "requests for gender-affirming facility access could be questioned," precisely because "only subjective 'self-identification' [was] offered as the basis for the . . . requests." *Martinsville*, 75 F.4th at 765.

As such, Seventh Circuit precedent affirming district courts' allowing transgender students access to opposite-sex school facilities is inapt. *See Martinsville*, *supra*; *see also Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1040 (7th Cir. 2017) (allowing a biological female high school student, who had "publicly transition[ed]" to living as male, access to the boys' restrooms). The Seventh Circuit itself questioned the continuing vitality of that precedent following the Supreme Court's decision in *United States v. Skrmetti*, 145 S. Ct. 1816 (2025), which held that state laws prohibiting sex-transitioning medical treatments for minors are not subject to heightened scrutiny under the Equal Protection Clause. *See D.P. by A.B. v.*

3

*Mukwonago Area Sch. Dist.*, No. 23-2568, 2025 WL 1794428, at \*1 (7th Cir. June 30, 2025) (granting panel rehearing to consider whether the court should overrule *Whitaker* and *Martinsville* in light of *Skrmetti*), *vacating* 140 F.4th 826 (7th Cir. 2025).[1]

Regardless of how the Seventh Circuit ultimately resolves this issue, the answer demanded by this case is straightforward: Biological males ought not be granted access to school facilities reserved for females merely by declaring a preference for such facilities, and especially so when school officials coerce females to undress in the presence of a male student granted such access.

## II. FACTUAL BACKGROUND

### A. The February 2025 Events and the School District's Policy

In February 2025, C.G. was a thirteen-year-old girl enrolled in the eighth grade at the School. On Monday, February 24, 2025, C.G. and her female classmates entered the girls' locker room to change for physical education (PE) class. There, they encountered a biological male student—whom C.G. knew from the neighborhood, and who lived across the street from her—standing among the lockers. He was dressed as a male, spoke as a male, and appeared in every respect as a male. (Compl. ¶ 2; C.G. Decl. ¶ 3; Georgas Decl. ¶ 4). Feeling unsafe and violated, C.G. and several classmates refused to change clothes in his presence and participated in PE that day still wearing their school clothes as a silent protest. (Compl. ¶ 3; C.G. Decl. ¶ 4).

---

[1] *Mukwonago* involved as plaintiff-appellee a biological male student "diagnosed with gender dysphoria by a medical doctor and . . . under the care of a therapist for emotional and psychological support." 681 F. Supp. 3d 886, 889 (E.D. Wis. 2023). After obtaining a preliminary injunction to access female-only spaces at school, and defending that preliminary injunction on appeal, 140 F.4th 826 (7th Cir. 2025), the plaintiff-appellee moved to voluntarily dissolve the injunction following the Seventh Circuit's vacating the affirmance. By granting the plaintiff-appellee's motion and dissolving the preliminary injunction, No. 23-cv-876 (E.D. Wis. Aug. 21, 2025), the district court deprived the Seventh Circuit of jurisdiction, which consequently dismissed the appeal. No. 23-2568 (7th Cir. Aug. 26, 2025). As a result, it is unclear whether under Seventh Circuit caselaw, the term "sex" in Title IX "refer[s] to biological sex (encoded in a person's genes) or to social relations (gender)." *Martinsville*, 75 F.4th at 775 (Easterbrook, J., concurring).

4

The next day, February 25, 2025, the same male student was again in the girls' locker room. This time, Assistant Superintendent Ford, Associate Principal Van Treese, and other staff members entered the locker room and ordered the girls to change into their PE clothes while the male student remained present. The girls, including C.G., were forced to undress to their sports bras and underwear in front of the male student and under the direct supervision of adult administrators. (Compl. ¶¶ 4–5; C.G. Decl. ¶ 5; Georgas Decl. ¶¶ 5–6).

On February 27, 2025, when the male student appeared a third time and Ford and Van Treese again demanded compliance, C.G.—overcome with fear and humiliation—ran crying from the locker room and called her mother. (Compl. ¶ 6; C.G. Decl. ¶ 6).

These events were the direct result of the School District's policy and practice of granting biological males unrestricted access to girls' locker rooms and other female-only intimate spaces based solely on such male students' self-declared preferences, without requiring any medical diagnosis, treatment, consistent presentation, and without offering these male students alternative use of available single-occupancy changing facilities. (Compl. ¶¶ 10–12).

### B. Defendants' Response and Coercion

When the girls protested, school officials accused them of "misgendering" and threatened disciplinary consequences if they continued to object. (Compl. ¶ 3). The girls were told they must either undress in front of the male student or face punishment. (C.G. Decl. ¶¶ 5–7; Georgas Decl. ¶ 8).

### C. Ongoing Harm and Withdrawal from School

These events caused C.G. severe and continuing emotional distress, including anxiety, humiliation, and recurring nightmares. (C.G. Decl. ¶ 8). She lost trust in school authorities, feared using the locker room, and could no longer feel safe at the School. At C.G.'s request, her mother

5

withdrew her from the school effective October 14, 2025, and began homeschooling her. (C.G. Decl. ¶¶ 9–10; Georgas Decl. ¶¶ 10–11).

The School serves students in grades six through eight. When withdrawn, C.G. was in eighth grade. Unless she is able to return to the School this academic year, she will miss the eighth-grade graduation ceremony with the classmates she has known since kindergarten. Beginning in the fall of 2026, she will be zoned to attend Deerfield High School, a different school with a different student body. The opportunity to complete her middle-school education at the School and to graduate with her longtime friends will therefore be lost forever if Defendants' policy is not immediately enjoined. C.G. very much wants to return to in-person classes with her friends, but she cannot so long as Defendants continue to enforce a policy that forces her to share locker rooms with biological males. (C.G. Decl. ¶ 11; Georgas Decl. ¶ 12).

## III.    ARGUMENT

To obtain a TRO or Preliminary Injunction, Plaintiff must make a strong showing of: (1) likely succeeding on the merits; (2) irreparable harm absent preliminary relief; (3) a balance of equities tipping in her favor; and (4) an injunction being in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (holding that party seeking injunction must make a "strong" showing, revealing how it proposes to prove its case); *cf. Nken v. Holder*, 556 U.S. 418, 426, 434 (2009) (articulating similar requirements for stays and noting "the substantial overlap" with preliminary injunctions).

Courts in the Seventh Circuit may apply a sliding scale, where a stronger showing on some factors compensates for a weaker showing on others. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008), *abrogated on other grounds by Nken*, 556 U.S. at 434. "The standards for issuing a temporary restraining order and a preliminary

6

injunction are identical." *Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052, 1058 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175 (7th Cir. 2023). Plaintiff satisfies all requirements here.

### A. *Plaintiff Is Likely to Succeed on the Merits.*

#### 1. *Defendants' Policy Violates the Equal Protection Clause (Count I).*

The Equal Protection Clause mandates that individuals in similar circumstances be treated equally. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Clause prohibits intentional and arbitrary discrimination. *See Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Typically, state actions are presumed valid and upheld if the classification is rationally related to a legitimate state interest. *City of Cleburne*, 473 U.S. at 440. This rational-basis standard, however, does not apply to sex-based classifications. *Whitaker*, 858 F.3d at 1050.

For sex-based classifications, the state bears the burden of proving an "exceedingly persuasive" justification. *United States v. Virginia*, 518 U.S. 515, 533 (1996). The state must demonstrate that the classification advances important governmental objectives and that the discriminatory methods are substantially related to achieving those objectives. *Id.* Justifications cannot rely on hypothesized or *post hoc* rationales developed during litigation, nor on broad generalizations about sex; they must be authentic. *Whitaker*, 858 F.3d at 1050.

The School District's policy at issue here accommodates male students with non-conforming gender preferences in multi-use sex-segregated spaces previously reserved for females. This amounts to discrimination against the female students because it denies them the use of secure sex-segregated spaces free from intrusion by males.

This discrimination is sex-based. The spaces that have been selected to accommodate biological male students with non-conforming gender preferences are the ones previously reserved

for the exclusive use of female students. The sole criterion in selecting these spaces is that they were originally designated for the opposite sex. To put it another way, the sex of a space's original designees alone determines whether that space has now been, or will be, repurposed for accommodating male students with non-conforming gender preferences. This policy disproportionately harms female students, who must endure privacy violations or forgo changing for PE classes altogether, thereby disrupting their education. (Compl. ¶¶ 3–6; Ex. 1, C.G. Decl. ¶¶ 4–6).[2]

In *Whitaker*, 858 F.3d at 1051–54, the Seventh Circuit held that discrimination based on the social construct of sex, such as gender identity, triggers heightened scrutiny under the Equal Protection Clause. The policy at issue in that case, which required restroom use be based on birth-certificate sex, was held to discriminate against transgender students by enforcing sex-based stereotypes, and thus, failing to provide an "exceedingly persuasive" justification. *Id.* at 1051–52 (citing *Virginia*, 518 U.S. at 533).

Here, the School District's policy, allowing any biological male access to female-only spaces based solely on a self-declared preference, without evidence of enduring female gender identity, constitutes an even clearer violation of the Equal Protection Clause. Lacking any basis in a recognized social construct of sex, much less in biological sex, this policy disproportionately harms biological girls like C.G.

The *Whitaker* court invoked heightened scrutiny to a sex-based classification denying transgender students restroom access aligned with their gender identity, finding that the

---

[2] Moreover, if Defendants' policy similarly allows biological females access to male-only spaces based on self-declared preferences, this too would constitute sex-based discrimination—against male students. It is entirely possible for a policy to discriminate against both sexes simultaneously by undermining the privacy and safety of sex-segregated spaces for all students. But the record here focuses on the harm to female students, as evidenced by C.G.'s traumatic experience.

classification relied on stereotypes without a valid justification. *Id.* at 1051. By comparison, the School District's policy here creates a sex-based classification by permitting biological males to use female-only spaces based only on self-declared preferences, directly infringing on female students' privacy. C.G.'s forced undressing to her underwear in front of a biological male—while adult administrators watched to enforce compliance—highlights this harm. (Compl. ¶¶ 4–6; C.G. Decl. ¶¶ 5–6). Unlike *Whitaker*, where the policy at least engaged gender identity, the School District's policy here relies on mere preference.

The School District's policy fails heightened scrutiny, offering no important governmental objective for prioritizing one male student's preference over the privacy and safety of every female middle schooler. By forcing girls like C.G. to share locker rooms or face discipline, the policy imposes a disproportionate burden. This differential treatment hinges on a starkly arbitrary criterion—preference—constituting a clear violation of the Equal Protection Clause.

*Whitaker*, 858 F.3d at 1053–54, criticized the arbitrariness of relying on birth certificates. The School District's policy is even more arbitrary: it requires no objective criteria whatsoever for male access to female spaces. This forces female students to endure humiliation and, in C.G.'s case, ultimately to withdraw from school.

*Whitaker*'s reasoning applies here *a fortiori*: the School District's reliance on preference, rather than gender identity, creates a more blatant sex-based classification. While *Whitaker* protected transgender students from exclusion based on stereotypes, the policy here stigmatizes biological girls by denying them secure, sex-segregated spaces and compelling them to accommodate male preferences. This direct and unjustified infringement on female students' privacy and safety warrants stronger Equal Protection Clause protection for biological girls like C.G. than for the transgender students in *Whitaker*.

2.     *Defendants' Policy Violates Title IX (Count II).*

Title IX prohibits sex-based discrimination in federally funded educational programs, including policies that create a hostile educational environment. 20 U.S.C. § 1681(a); *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

The School District receives substantial federal funding and is therefore subject to Title IX. (Compl. ¶ 23). Defendants intentionally discriminate against female students by adopting and aggressively enforcing a policy that grants biological males unrestricted access to girls' locker rooms based solely on such male students' self-declared preferences, without requiring any medical diagnosis, treatment, consistent presentation as female, or offering the male students use of available single-occupancy facilities as alternatives. (Compl. ¶¶ 10–12).

This policy deprives C.G. and every other female student of the equal benefit of sex-segregated locker rooms and subjects them to opposite-sex exposure, humiliation, and fear. Defendants' deliberate indifference—and indeed active coercion—is unmistakable: Assistant Superintendent Ford and Associate Principal Van Treese twice entered the girls' locker room and ordered minor girls to undress to their underwear in front of a biological male while the administrators stood watch to ensure compliance, threatening discipline for any refusal. (Compl. ¶¶ 4–6; C.G. Decl. ¶¶ 5–6).

The Seventh Circuit in *Whitaker*, 858 F.3d at 1048–50, and *Martinsville*, 75 F.4th at 769–70, held that denying students access to facilities consistent with their gender identity can constitute sex discrimination under Title IX. Whatever the continuing force of those decisions after *Skrmetti*, 145 S. Ct. 1816 (2025), the principle cuts decisively the other way here: forcing female students to share intimate spaces with biological males based on nothing more than the male student's subjective preference—notwithstanding that the male student presented outwardly as

10

male and offered no evidence of gender dysphoria, medical transition, or consistent female identity (Compl. ¶ 2; Ex. 1, C.G. Decl. ¶ 3)—is sex-based discrimination, pure and simple.

Because Defendants have ready, less-intrusive alternatives (in the form of single-occupancy gender-neutral changing rooms), yet deliberately chose to subordinate female students' privacy and safety to one male student's preference, they violated Title IX by subjecting the female students to "discrimination under an[] education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The resulting harm to C.G.—severe anxiety, nightmares, and effective exclusion from her public middle school (C.G. Decl. ¶¶ 8–11)—confirms the discriminatory impact.

### 3. *Defendants' Actions Violate the First Amendment (Count III).*

The First Amendment, made applicable to the States through the Fourteenth Amendment, prohibits government officials from retaliating against or compelling the speech of private citizens, including public-school students. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969); *see also Mahanoy Area Sch. Dist. v. B.L.*, 594 U.S. 180, 186–89 (2021).

When C.G. and her female classmates engaged in a silent, non-disruptive protest—refusing to undress in front of a biological male student—school officials immediately accused them of "misgendering" the male student and threatened disciplinary consequences if they persisted in their objection. (Compl. ¶ 3). This constitutes classic viewpoint discrimination and retaliation for protected expression: the girls were punished not for any disruption, but solely because they expressed (through words and conduct) the viewpoint that biological males do not belong in girls' locker rooms.

Defendants' actions also compel speech. By ordering the girls to change clothes in the male student's presence while administrators stood watch, and by threatening punishment for refusal,

11

Defendants effectively forced C.G. and her classmates—on pain of discipline—to communicate, through their obedient undressing, the message that they accept and affirm the presence of a biological male in their intimate space. Compelled affirmation of a controversial ideological position violates the First Amendment no less in a middle-school locker room than in a flag-salute ceremony. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

Because Defendants' retaliation and compulsion targeted core protected speech and occurred outside any special context that might justify restriction (the changing period was not instructional time, and the protest caused no disruption), their actions are subject to strict scrutiny, which they cannot satisfy. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015).

**B.** **_Plaintiff Will Suffer Irreparable Harm Absent Immediate Relief._**

Irreparable harm is presumed when a plaintiff demonstrates a strong likelihood of success on a constitutional claim and when the violation is ongoing. *Ezell v. City of Chicago*, 651 F.3d 684, 699–700 (7th Cir. 2011); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). The same presumption applies to ongoing violations of fundamental privacy rights and Title IX sex-discrimination claims. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 212–13 (3d Cir. 2020); *Parents for Privacy v. Barr*, 949 F.3d 1210, 1237 (9th Cir. 2020).

C.G. is currently suffering—and will continue to suffer—precisely such irreparable harm. Because of Defendants' policy and their coercive enforcement of it in February 2025, C.G. has been effectively excluded from her public middle school since October 14, 2025, and is now being homeschooled. (C.G. Decl. ¶¶ 9–10; Georgas Decl. ¶¶ 10–11). She suffers daily from severe anxiety, recurring nightmares, and the loss of in-person education with her friends and classmates she has known since kindergarten. (C.G. Decl. ¶ 8). Unless the policy is enjoined, C.G. will miss

12

her eighth-grade graduation at the School this spring—an event that cannot be replicated or compensated with money.

The Seventh Circuit has repeatedly recognized that psychological injury, stigmatization, and deprivation of equal educational access constitute irreparable harm. *Whitaker*, 858 F.3d at 1045–46; *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir. 2006). Here, that harm is neither speculative nor minimal: C.G. was forced to undress in front of a biological male while school administrators watched and threatened punishment for refusal. (Compl. ¶¶ 4–6). The trauma from that experience continues, and the only way to stop its daily aggravation is to permit C.G. to return to school without fear that the same violation will recur.

No award of money damages can restore C.G.'s lost school year, undo the psychological injury already inflicted, or recreate the once-in-a-lifetime experience of graduating middle school with her longtime friends. Absent immediate injunctive relief, this irreparable injury will only grow worse with each passing day of the current school year.

### C. *The Balance of Equities Strongly Favors Plaintiff.*

On one side stands a fourteen-year-old girl who has already been forced to undress in front of a biological male while adult administrators watched to enforce compliance, who suffers continuing nightmares and anxiety, and who has been driven out of her public middle school as a result. (C.G. Decl. ¶¶ 5–9). Unless relief is granted immediately, she will permanently lose the remainder of her eighth-grade year and be deprived of the singular opportunity of graduating middle school with the classmates she has known since kindergarten.

On the other side stands Defendants' insistence that one male student's subjective unverified preference must override the bodily privacy of every female student in the building. Defendants face no hardship in accommodating that male student's preference by offering him

single-occupancy gender-neutral changing facilities. (Compl. ¶ 11). Requiring their use would impose no meaningful burden on anyone, while fully preserving the privacy and dignity of female students.

Moreover, Congress expressly contemplated and approved the maintenance of sex-segregated facilities in schools. 20 U.S.C. § 1686. A policy that allows any biological male to enter girls' locker rooms simply by declaring a preference—without medical diagnosis, consistent presentation, or any objective criterion—does not "reinforce the concept of separate facilities for boys and girls," *Whitaker*, 858 F.3d at 1055; it guarantees their demise. The equities therefore demand that this Court preserve, not destroy, the sex-segregated privacy Congress intended to protect.

### D. An Injunction Is in the Public Interest.

An injunction would serve the public interest by ensuring compliance with federal law and protecting students' constitutional and statutory rights. *See Nken*, 556 U.S. at 435–36. Defendants' policy of granting biological males unrestricted access to girls' locker rooms based solely on subjective unverified self-declaration undermines the strong public interest in safe, equitable, and non-discriminatory educational environments. It sacrifices the bodily privacy and psychological well-being of every female student to accommodate the preference of a single male student who presented outwardly as male and offered no evidence of gender dysphoria, medical treatment, or consistent female identity. (Compl. ¶¶ 2, 10–12).

Vindicating the strong public interest in safeguarding constitutional and statutory rights decisively outweighs any reliance on non-binding guidance from the Illinois Department of Human Rights. Non-regulatory guidance lacks the force of law. *Compare Illinois Dep't of Revenue v. Illinois Civ. Serv. Comm'n*, 357 Ill. App. 3d 352, 363, 827 N.E.2d 960, 970 (2005) ("Properly

14

promulgated administrative regulations have the force and effect of law."). Even if this guidance somehow did have the force of law, "state law that impinges upon a substantive right or liberty created or conferred by the Constitution is, of course, presumptively invalid." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 61 (1973) (Stewart, J., concurring). Likewise, "Title IX would preempt state law." *Soule v. Connecticut Ass'n of Sch.*, 755 F. Supp. 3d 172, 195 n.18 (D. Conn. 2024).

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff C.G. respectfully requests that this Court:

**A.**    ***Issue a Temporary Restraining Order***, with the shortest possible notice, prohibiting Defendants, their agents, employees, and all persons acting in concert with them from permitting biological male students to use girls' locker rooms or other female-only intimate facilities at the School based solely on a male student's self-declared gender preference, effective immediately;

**B.**    ***After a Hearing, Issue a Preliminary Injunction***, granting the same relief pending final judgment in this action, thereby allowing C.G. to return immediately and safely to in-person education at her neighborhood middle school; and

**C.**    ***Grant Such Other and Further Relief***, as the Court deems proper.

Dated: December 1, 2025

Respectfully submitted,

/s/ Ajay Gupta
Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, Illinois 60563
(630) 854-7194
ajguptaemail@gmail.com
N.D. Ill. Bar No. 190101

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Ajay Gupta, an attorney, hereby state that on December 1, 2025, I electronically filed the foregoing document using the Court's CM/ECF Filing System, which will send electronic notice to all counsel of record.

/s/ Ajay Gupta
Ajay Gupta

17

# EXHIBIT 1

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| C.G., a minor, by and through her<br>next friend and mother, NICOLE GEORGAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:25-cv-13406 |
| | ) | |
| v. | ) | Judge: Rebecca Pallmeyer |
| | ) | |
| DEERFIELD PUBLIC SCHOOLS DISTRICT<br>109, JOANNA FORD, in her official capacity as<br>Assistant Superintendent for Student Services for<br>Deerfield Public Schools District 109, and<br>in her personal capacity, and<br>CATHY VAN TREESE, in her official capacity as<br>Associate Principal of Alan B. Shepard<br>Middle School, and in her personal capacity, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF** ███████████████████████ **(C.G.)**
**IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND**
**PRELIMINARY INJUNCTION**

I, ██████████████ (C.G.), do hereby depose and state as follows:

1.      I submit this declaration in support of Plaintiff's complaint for declaratory and injunctive relief and monetary damages.

2.      I am a fourteen-year-old female who was formerly enrolled at Alan B. Shepard Middle School in Deerfield, Illinois (the School). My mother, Nicole

1

Georgas, withdrew me from the School effective October 14, 2025, and has been homeschooling me since then.

3. On Monday, February 24, 2025, when I had not yet turned fourteen, I entered the girls' locker room at the School before a physical education (PE) class with my female classmates. Inside, I saw a male student I knew from my neighborhood standing among the lockers. He was dressed, spoke, and appeared as a male.

4. I felt uncomfortable and unsafe seeing a boy in the girls' locker room. I refused to change my clothes so long as he was present and, along with several other girls, stayed in my regular clothes through that day's PE class as a form of protest.

5. The next day, February 25, 2025, Joanna Ford, Assistant Superintendent for Student Services at Deerfield Public Schools District 109, and Cathy Van Treese, Associate Principal of the School, entered the girls' locker room with other staff members. The male student was there once again. Ms. Ford and Ms. Van Treese forced us to change into our gym clothes in the presence of the male student while they watched over us. I had to undress to my sports bra and underwear. I felt humiliated, frightened, and violated.

6. On February 27, 2025, the male student was present in the locker room yet again, and Ms. Ford and Ms. Van Treese once again demanded that we change into our gym clothes in his presence and while they watched. Overwhelmed with fear,

2

I ran out of the locker room and called my mother in tears, telling her I could not bear the humiliation anymore.

7. After these incidents, I was afraid to change for PE class. I lost trust in the officials and staff at the School and avoided the locker room altogether.

8. I suffered ongoing anxiety, humiliation, and nightmares after being forced to change in front of a male student while adult administrators watched over me. I no longer felt safe at the School.

9. To spare me further emotional distress, at my request, my mother withdrew me from the School and began homeschooling me.

10. I do not want to be forced to share locker rooms or other private girls-only spaces with male students or to risk having my privacy violated again.

11. If I can be assured that male students will not be granted access to the School's girls-only spaces, I would very much wish to continue my education at the School.

12. I do not want to proceed in court using my full name because I fear retaliation and because I want to protect my privacy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Deerfield, Illinois, on this, the 30th day of November, 2025.



(C.G.)

4

# EXHIBIT 2

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| C.G., a minor, by and through her<br>next friend and mother, NICOLE GEORGAS,<br><br>                   Plaintiff,<br><br>v.<br><br>DEERFIELD PUBLIC SCHOOLS DISTRICT<br>109, JOANNA FORD, in her official capacity as<br>Assistant Superintendent for Student Services for<br>Deerfield Public Schools District 109, and<br>in her personal capacity, and<br>CATHY VAN TREESE, in her official capacity as<br>Associate Principal of Alan B. Shepard<br>Middle School, and in her personal capacity,<br><br>                   Defendants. | Case No.: 1:25-cv-13406<br><br>Judge: Rebecca Pallmeyer |

## DECLARATION OF NICOLE GEORGAS IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

I, Nicole Krinch Georgas, do hereby depose and state as follows:

1. I am the mother and next friend of Plaintiff C.G., who is the minor child bringing this action. I am over the age of eighteen and competent to testify. I make this declaration based on my own personal knowledge and what C.G. has told me.

2. C.G. is now fourteen years old and was thirteen years old at the time of the events of February 2025 described below.

1

3.     Until October 14, 2025, C.G. was enrolled as an eighth-grade student at Alan B. Shepard Middle School (the School) in Deerfield, Illinois, which is operated by Deerfield Public Schools District 109 (the School District). Prior to the events described below, C.G. was a happy, outgoing child who loved school, especially her physical education (PE) classes, during which she enjoyed social time with friends and the physical activities.

4.     On February 24, 2025, C.G. relayed to me that earlier that day, she entered the girls' locker room at the School before a physical education (PE) class with her female classmates, and they encountered there, standing among the lockers, a student whom C.G. has long known from our neighborhood as a male. She told me that this student was dressed, spoke, and appeared as a male. C.G. confided in me that she felt uncomfortable and unsafe seeing a boy in the girls' locker room. She added that she refused to change her clothes so long as this student was present and, along with several of her female classmates, stayed in her regular clothes through that day's PE class as a form of protest.

5.     The next day, February 25, 2025, C.G. relayed to me that this male student was again present in the girls' locker room at the School before her PE class that day. C.G. added that on this day, Joanna Ford, Assistant Superintendent for Student Services at the School District, accompanied by Cathy Van Treese, Associate Principal at the School, along with other teachers, walked into the girls' locker room and forced

2

C.G. and the other female students in her PE class to change into their PE clothes in the presence of this male student. With Joanna Ford and Cathy Van Treese standing watch over them, C.G. and her classmates were ordered to undress while this male student remained in the girls' locker room. C.G. was made to strip down to her sports bra and underwear. From her tone and demeanor as she relayed this, I could tell that C.G. was traumatized by her experience at the School that day.

6.     On February 27, 2025, I received a frantic phone call from C.G. during the school day. She was crying hysterically and barely able to speak through her sobs. She told me that School District and School officials, including Joanna Ford and Cathy Van Treese, were forcing her and other girls once again to change clothes in the girls' locker room in front of a male student. C.G. said she had run out of the locker room because she couldn't bear to go through this again, and that she felt scared, humiliated, and trapped.

7.     After C.G. returned home that day, she expressed feeling betrayed by the adults who should have protected her privacy as a girl.

8.     That afternoon, I exchanged messages with School Principal Rob Wegley seeking to get an explanation and demand a solution. Instead of addressing the male student's access to the School's girls-only facilities or directing that student to the available single-use gender-neutral bathroom, Mr. Wegley suggested that C.G. and any other girls who were uncomfortable with his presence switch to a different PE class.

3

9. I have made multiple inquiries of School District officials about the policy of allowing biological male students to access female-only spaces based solely on self-declared gender preferences. I have learned that the School District follows non-regulatory guidance from the Illinois Department of Human Rights, which permits such access without medical verification or consistent gender expression, and without requiring that single-use gender-neutral spaces be offered as an alternative.

10. The impact on C.G. of what happened on February 24–27, 2025, when she was ordered to and forced to undress in front of a male student while School District and School officials watched over her, was devastating and immediate. After February 27, 2025, she refused to change in the locker room out of fear, wearing her regular clothes to PE, which affected her participation. She complained of experiencing nightmares in which she relived the humiliation of those days. C.G., who was once bubbly and eager for school, became anxious and withdrawn. She lost interest in activities she loved, like sports and sleepovers with friends. I noticed her confidence erode.

11. Unwilling to subject C.G. to further harm, I made the difficult decision to withdraw her from the School effective October 14, 2025, and began homeschooling her. This was not a choice I wanted—homeschooling has been logistically challenging and isolating for her, depriving her of peer interactions and extracurricular activities. C.G. misses her friends deeply and has expressed wanting to return to school, but the

4

fear of the policy of sharing the School's girls-only spaces with male students prevents it.

12.    The School District's policy continues to pose an immediate and irreparable harm to C.G. So long as that policy remains in place, C.G. cannot safely return to school, continuing the disruption to her education. The harm to her is ongoing and cannot be fully remedied by money damages alone. As a mother, I can see that her sense of security as a young woman has been profoundly impacted.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Deerfield, Illinois, on this, the 30th day of November, 2025.



Nicole Krinch Georgas

5