# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| C.G., a minor, by and through her<br>next friend and mother, NICOLE GEORGAS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No.: 1:25-cv-13406 |
| | ) | |
| v. | ) | Judge: Rebecca Pallmeyer |
| | ) | |
| DEERFIELD PUBLIC SCHOOLS DISTRICT 109,<br>JOANNA FORD, in her official capacity as Assistant<br>Superintendent for Student Services for Deerfield Public<br>Schools District 109, and in her personal capacity, and<br>CATHY VAN TREESE, in her official capacity as<br>Associate Principal of Alan B. Shepard Middle School,<br>and in her personal capacity, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S REPLY TO**
**DEFENDANTS' RESPONSE IN OPPOSITION TO**
**PLAINTIFF'S MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff C.G., a minor, by and through her next friend and mother, Nicole Georgas (Georgas), respectfully submits this reply to Defendants' response (ECF 24, Resp.), opposing Plaintiff's motion for a temporary restraining order and preliminary injunction (ECF 18, Mot.).[1]

## I.      PROCEDURAL BACKGROUND

Plaintiff filed her complaint on November 1, 2025 (ECF 1, Compl.), followed on December 1, 2025, by a motion for a temporary restraining order (TRO) and preliminary injunction (ECF 18, Mot.), accompanied by sworn declarations by C.G. (ECF 18, Ex. 1, C.G. Decl.) and Georgas (ECF 18, Ex. 2, Georgas Decl.). Reflecting agreement of the parties, the Court ordered Defendants'

---

[1] Terms not defined herein have the meaning ascribed to them in Plaintiffs' motion (ECF 18).

response filed by December 10, 2025, and Plaintiff's reply by December 15, 2025. (ECF 20). Defendants lodged an oversized response on December 10, 2025 (ECF 22, Ex. A), filing it December 11, 2025 (ECF 24, Resp.). Attached to Defendants' response are four separate declarations, by, respectively, Michael Simeck, the School District's Superintendent (ECF 24, Ex. 1, Simeck Decl.), individual Defendant Van Treese (ECF 24, Ex. 2, Van Treese Decl.), individual Defendant Joanna Ford (ECF 24, Ex. 3, Ford Decl.), and Ginger Logemann, the School District's Director for Student Services (ECF 24, Ex. 4, Logemann Decl.). Plaintiff now timely replies to Defendants' response. Attached hereto as Exhibit 1 is C.G.'s second declaration (Ex. 1, C.G. 2d Decl.), supplementing her prior declaration (ECF 18, Ex. 1, C.G. Decl.), and directly rebutting many of Defendants' factual assertions.

## II.     ARGUMENT

With the Seventh Circuit having vacated its decision in *D.P. by A.B. v. Mukwonago Area School District*, 140 F.4th 826 (7th Cir. 2025), *vacated and reh'g granted*, 2025 WL 1794428, *appeal dismissed*, No. 23-2568 (7th Cir. Aug. 26, 2025), the only binding Circuit precedent governing this case comprises *Whitaker by Whitaker v. Kenosha Unified School District No. 1 Board of Education*, 858 F.3d 1034 (7th Cir. 2017), and *A.C. by M.C. v. Metropolitan School District of Martinsville*, 75 F.4th 760 (7th Cir. 2023)—both of which involved biological female students seeking access to boys-only facilities, leaving no controlling authority mandating that biological males be granted access to girls-only spaces. In any event, those cases went to great lengths to emphasize the biological females' consistent, enduring gender identities, supported by medical diagnoses, hormone treatments, legal changes, and years-long social transitions, precisely to ensure that such accommodations could not be abused by opportunistic or inconsistent claims. By contrast, the School District's policy here dispenses with any requirement for verification or

consistency, opening the door to potential abuse and leaving vulnerable middle-school-aged girls exposed to risks of voyeurism and exhibitionism in intimate spaces meant to protect their privacy during a sensitive developmental stage.

A. ***Plaintiff Has Standing to Seek Injunctive Relief Despite Her Withdrawal from School, as the Ongoing Policy Inflicts Concrete, Imminent Harm by Barring Her Safe Return, Satisfying Injury in Fact, Causation, and Redressability Under Binding Precedent.***

Defendants contend that C.G. lacks standing to seek injunctive relief because she voluntarily withdrew from the School on October 14, 2025, prior to filing suit on November 1, 2025, and thus faces no "real and immediate" threat of future harm from the School District's policy. (Resp. at 6–7).[2] They characterize her withdrawal as a "self-inflicted wound[]" that breaks the chain of causation, relying on *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003), and analogizing to cases like *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), and *Simic v. City of Chicago*, 851 F.3d 734 (7th Cir. 2017), where plaintiffs sought to enjoin policies without showing a likelihood of recurring exposure. (Resp. at 7). This argument misconstrues both the facts and the law.

C.G. satisfies all three elements of standing—injury in fact, causation, and redressability—under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992), and *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Her withdrawal was not voluntary but a direct response to the School District's unconstitutional policy, which continues to inflict ongoing harm by preventing her safe return to public school.

---

[2] In the Defendants' response (ECF 24), the page numbers shown on the ECF-stamped header differ from the page numbers exhibited in the footer section of the document. A citation herein to any page number in the Defendants' response refers to the page number in the footer section of that document instead of the page number shown on the ECF-stamped header.

First, C.G. has suffered—and continues to suffer—a concrete, particularized, and actual or imminent injury in fact. *TransUnion*, 594 U.S. at 423. In February 2025, the School District's policy forced C.G., then a 13-year-old girl, to undress in the presence of a biological male student in the girls' locker room, under the supervision of adult administrators including Defendants Ford and Van Treese. (Compl. ¶¶ 4–6; C.G. Decl. ¶¶ 5–7; Georgas Decl. ¶¶ 5–8; C.G. 2d Decl. ¶¶ 7–9, 11). This incident caused severe psychological trauma, including anxiety, humiliation, nightmares, and a loss of trust in school authorities. (C.G. Decl. ¶ 8; Georgas Decl. ¶¶ 9–10). Far from a one-time event, the harm is ongoing: the policy remains in effect, permitting any biological male to access female-only intimate spaces based solely on self-declaration, without requiring medical documentation, consistent presentation, or use of alternative single-occupancy facilities. (Compl. ¶¶ 10–12). As a result, C.G. cannot safely return to the School without risking repeated violations of her privacy, bodily integrity, and constitutional rights. Her homeschooling is not a preference but a necessity to avoid further exposure, and it deprives her of in-person education with her peers, exacerbating her isolation and emotional distress. (Georgas Decl. ¶¶ 11–12; C.G. 2d Decl. ¶¶ 12–14). This constitutes an "actual or imminent" injury for injunctive purposes, as the threat of recurrence is neither "conjectural" nor "hypothetical." *Lujan*, 504 U.S. at 560; *cf. Lyons*, 461 U.S. at 107 n.8 (noting standing exists where a plaintiff "would have to allege that he would have another encounter with the police" under circumstances triggering the policy).

Defendants' reliance on *Lyons* and *Simic* is misplaced. In *Lyons*, the plaintiff sought to enjoin a police chokehold policy after a single encounter but continued driving in Los Angeles without alleging any intent to violate traffic laws that might lead to another stop. 461 U.S. at 105–06. Similarly, in *Simic*, the plaintiff challenged a parking ticket policy after paying a fine but showed no intent to repeat the violation. 851 F.3d at 738–39. Here, by contrast, C.G. wants to

4

return to her neighborhood public school, but the School District's policy makes it impossible without subjecting her to the same harms. (Georgas Decl. ¶ 12; Mot. at 2; C.G. 2d Decl. ¶ 16). This is akin to cases where plaintiffs have standing to challenge exclusionary policies that force them out of public institutions. See, e.g., *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1017 (7th Cir. 2002) (students had standing to seek injunction against discriminatory placement policies that led to their removal from general education); *cf. Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020) (standing exists where government action imposes ongoing restrictions on access to public benefits or forums). The injury is not merely past; it is the policy's persistent effect that excludes C.G. from school today.

Second, C.G.'s injuries are fairly traceable to the School District's policy and the individual Defendants' enforcement of it. *Lujan*, 504 U.S. at 560. The February 2025 incidents were a direct application of the policy, which prioritizes self-declared preferences over female students' privacy rights. (Compl. ¶¶ 2–6; C.G. 2d Decl. ¶¶ 4–7). Defendants Ford and Van Treese personally enforced it by supervising the locker room and coercing compliance, including threats of discipline for "misgendering" or protesting. (C.G. Decl. ¶¶ 5–7; C.G. 2d Decl. ¶¶ 8–11). C.G.'s withdrawal was not "self-inflicted" in the sense of *Second City Music*, where the plaintiff voluntarily ceased business operations unrelated to the challenged ordinance. 333 F.3d at 850. Rather, it was a compelled response to avoid imminent harm, much like a student withdrawing to escape ongoing discrimination or harassment. See *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 421 (7th Cir. 2022) (causation satisfied where school's actions prompted parental decisions to protect the child); *cf. Whitaker*, 858 F.3d at 1045 (policy denying facility access caused emotional harm leading to avoidance behaviors). Defendants cannot evade causation by labeling the withdrawal "voluntary" when their policy left C.G. no safe alternative.

Finally, an injunction would redress C.G.'s injuries. *Lujan*, 504 U.S. at 561. Enjoining the policy would eliminate the barrier to her return, allowing her to resume in-person education at the School without fear of further violations. (Georgas Decl. ¶¶ 11–12; C.G. 2d Decl. ¶ 16). Defendants suggest no controversy exists because C.G. is not currently enrolled (Resp. at 7), but this ignores that the policy itself perpetuates her exclusion. Redressability requires only a "likel[ihood]" that relief will remedy the harm, not certainty. *TransUnion*, 594 U.S. at 423. Here, C.G. and her mother have declared their intent to re-enroll upon issuance of an injunction. (Georgas Decl. ¶ 11; C.G. 2d Decl. ¶ 11; C.G. 2d Decl. ¶ 16); cf. *Carney v. Adams*, 592 U.S. 53, 60 (2020) (standing turns on plaintiff's genuine intent to engage in the restricted activity).

In sum, C.G. has standing because the School District's policy inflicted past harm, imposes ongoing exclusion, and threatens future injury if she returns without relief. Defendants' attempt to insulate their policy from review by pointing to the very withdrawal it necessitated would undermine Article III's purpose of ensuring accountability for constitutional violations. The Court should reject this argument and proceed to the merits.

**B.** ***Defendants' Repeated Denials of Coercion Are Belied by Their Own Admissions of Official Presence, Demands for Compliance, and Threats of Discipline While a Biological Male Remained in the Girls' Locker Room.***

Throughout their response and the accompanying declarations, Defendants maintain a mantra-like chant, "No student was ever forced, required, or directed to change in front of any other student or school administrator, including Ford and Van Treese, **at any time**." (Resp. at 4 (citing Van Treese Decl. ¶¶ 18, 21; Ford Decl. ¶¶ 14, 15, 17, 18; Logemann Decl. ¶¶ 10-11) (boldface in original)). "Whether the asserted facts are sufficient to constitute coercion is a question of law for the court to decide." *Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.*, 245 F. Supp. 889, 894 n.8 (N.D. Ill. 1965) (collecting cases). Admissions contained in the declarations accompanying Defendants' response inexorably point to coercion here. If, however,

6

the Court concludes that Defendants have raised a genuine issue of material fact on the question of coercion, then it must conduct an evidentiary hearing.

Defendants' factual background (Resp. at 3–5) offers a sanitized and incomplete account of the male student's use of the girls' locker room, relying on self-serving declarations from administrators and staff that disregard key assertions in Plaintiff C.G.'s initial declaration. (C.G. Decl.) C.G.'s second declaration (C.G. 2d Decl.) directly rebuts many of Defendants' remaining assertions.

Contrary to Defendants' portrayal, school officials intimidated the girls by entering the locker room, demanding they change despite the presence of a biological male, and threatening disciplinary action for refusal—conduct that created a coercive and hostile environment. The limited private stalls are insufficient in number and practicality, forcing most girls to change in the open communal area where the male student was present and could observe them. C.G.'s declarations establish that the male student did not restrict himself to private areas but lingered in the open space, watching girls undress. (C.G. Decl. ¶¶ 3–6; C.G. 2d Decl. ¶¶ 6–7). In February 2025, he presented unambiguously as male, wearing typical male attire without makeup; his appearance has since shifted markedly—at times evidently female, at others that of a "furry."[3]

Defendants assert that the male student "did not change in the [girls'] locker room" until February 26, 2025 (Van Treese Decl. ¶ 9), and thereafter did so only "in a private stall" (Ford Decl. ¶ 16). These claims do not refute C.G.'s account that he watched girls change, as he necessarily crossed the open changing area to reach any stall—and, given the shortage of stalls,

---

[3] "The furry fandom is a set of subcultures interested in anthropomorphic animal characters, sometimes in sexual contexts." *Kendra Albert, Five Reflections from Five Years of Fosta/sesta*, 40 Cardozo Arts & Ent. L.J. 413, 434 n.104 (2022).

would inevitably have seen girls undressing unless he kept his eyes closed. (C.G. 2d Decl. ¶¶ 6–7).

The cubbies near the door are simply open storage for bags and belongings, not private changing spaces, and no cubbies were assigned to students, contrary to Defendants' suggestion. (Van Treese Decl. ¶ 9; *compare* C.G. 2d Decl. ¶ 5).

Defendants concede that a teacher's assistant accompanied the male student into the girls' locker room (Van Treese Decl. ¶ 12; Ford Decl. ¶ 13)—an admission of official school presence that coerced compliance. This concession also undermines Van Treese's and Ford's claims that they remained only in the hallway. (Van Treese Decl. ¶ 12; Ford Decl. ¶ 13). C.G. states that both officials entered deep into the locker room on February 25 and 27, 2025 (C.G. 2d Decl. ¶¶ 8–9), but even if they stayed in the hallway, the open area was clearly visible, allowing them to monitor compliance. (C.G. 2d Decl. ¶ 10).

Notably, Van Treese's declaration says nothing about her actions in the locker room on February 27, 2025, while Ford admits she "did supervise the locker room" that day (Ford Decl. ¶ 17)—without repeating her earlier claim of standing only in the hallway (*compare* Ford Decl. ¶ 13).

Even under Defendants' version of events, Ford and Van Treese confronted girls refusing to change, insisted on compliance while a biological male remained present, and threatened "minor infractions" for noncompliance—consequences that carry real punitive weight in school. (Van Treese Decl. ¶ 19; Ford Decl. ¶ 19). These admissions refute any characterization of mere benign "supervision" (Van Treese Decl. ¶ 12; Ford Decl. ¶ 17) and instead establish coercion.

The threat of minor infractions for refusing to change clothes in the presence of a biological male student establishes coercion. School officials explicitly warned students of such discipline

on February 25, 2025, compelling compliance under duress (Van Treese Decl. ¶ 19; Ford Decl. ¶ 19). Defendants' emphasis that no infractions were issued to C.G. personally, that none were given after February 27, and that they carried "no tangible consequences in themselves" or "never led to any assigned consequence" is irrelevant (Van Treese Decl. ¶¶ 19, 25; Ford Decl. ¶ 19). The mere threat of disciplinary action—regardless of whether it was ultimately enforced—created a chilling and intimidating environment that compelled compliance or avoidance, thereby establishing coercion. (C.G. 2d Decl. ¶ 11).

Seemingly in an attempt to ward off this ineluctable conclusion, Defendants resort to an incantation that "[n]o student was ever forced, required, or directed to change in front of any other student or school administrator." (ECF 24, at 4 (citing Van Treese Decl. ¶¶ 18, 21; Ford Decl. ¶¶ 14, 15, 17, 18; Logemann Decl. ¶¶ 10-11). That contention is simply untenable in light of the admissions contained in those declarations.

If the Court harbors any doubt whether C.G. was coerced into undressing in the presence of a male student, she requests an evidentiary hearing to cross-examine school officials, including Ford and Van Treese, under oath. "An evidentiary hearing is required if the nonmoving party raises genuine issues of material fact in response to a motion for a preliminary injunction." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 814 (7th Cir. 2002), as amended (Oct. 18, 2002). C.G. submits that coercion is established as a matter of law on the conceded facts, and mere denials do not create a genuine factual dispute. Should the Court conclude otherwise, however, a hearing is warranted. By offering to examine officials under oath, C.G. has satisfied her burden of showing she "intends to introduce evidence that, if believed, will so weaken the moving party's case as to affect the judge's decision on whether to issue the injunction." *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997).

**C.** ***Defendants' Policy Permits Biological Males Access to Girls' Locker Rooms Based Solely on Self-Declared Preferences, Without Objective Criteria or Verification—Eroding Sex-Segregated Privacy and Disproportionately Burdening Female Students.***

Defendants' response and accompanying exhibits together span forty-four pages and exceed 11,000 words. Yet across that extensive submission, Defendants never articulate any objective criteria governing when biological males may access girls' locker rooms. That omission is telling. It reflects the policy's fundamentally indeterminate design, which permits access based solely on a student's self-declared preference, without requiring medical documentation, consistent gender expression, or legal recognition. (*See* Simeck Decl. ¶¶ 4–7; Van Treese Decl. ¶¶ 5–6; Ford Decl. ¶¶ 6–7). By elevating unverified assertions over female students' privacy and bodily integrity, the policy plausibly violates both the Equal Protection Clause and Title IX and fosters a hostile educational environment for girls like C.G.

The record further demonstrates what Defendants do not dispute. They do not contest C.G.'s sworn description of the male student as presenting unambiguously as male—by dress, speech, and appearance—on the days he entered the girls' locker room. (Compl. ¶ 2; C.G. Decl. ¶ 3). At this stage, such unrebutted factual assertions are properly accepted. *See William v. San Francisco Unified Sch. Dist.*, 340 F. Supp. 438, 441 (N.D. Cal. 1972).

This silence undermines Defendants' contention that the policy merely accommodates "transgender students" accessing facilities "aligning with their gender identity." (Resp. at 3, 8). Instead, it reveals reliance on a conclusory label—invoking the term "transgender" while declining to articulate any standards by which that designation is assessed, verified, or limited. On this record, the label functions not as a factual descriptor but as a substitute for criteria.

As commonly understood in medical literature, "transgender" denotes an individual who consistently identifies with and adopts the gender role of the opposite biological sex. 1 B. Sadock,

V. Sadock, & P. Ruiz, *Comprehensive Textbook of Psychiatry* 2063 (9th ed. 2009). Courts likewise have described transgender students as those who "consistently, persistently, and insistently" identify as such, often accompanied by medical diagnoses, treatment, or legal changes. *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 807 (11th Cir. 2022); *Martinsville*, 75 F.4th at 773 (distinguishing such evidence from mere "self-identification").

C.G.'s observations show no such consistency, and Defendants identify none. (C.G. Decl. ¶ 3; C.G. 2d Decl. ¶ 4). To the contrary, in the weeks and months following the locker-room incidents, the male student's self-presentation varied markedly. On some occasions, he wore clothing or makeup stereotypically associated with girls; on others, he appeared in what C.G. describes as "furry" attire, including animal-themed costumes and accessories, and at times identified himself accordingly. (C.G. 2d Decl. ¶ 15). This variability—far from reflecting a consistent or enduring female gender identity—underscores the absence of any objective basis for Defendants' decision to authorize access to female-only intimate spaces.

The policy's lack of standards is especially consequential in the middle-school context, where students are navigating puberty, bodily development, and heightened vulnerability. Girls-only spaces serve important protective functions: they promote privacy, reduce the risk of harassment, and support psychological well-being during a sensitive developmental period. When those spaces are opened without criteria or safeguards, girls like C.G. experience anxiety, distress, and trauma. (Compl. ¶¶ 3–7; C.G. Decl. ¶¶ 6–9).

Defendants' repeated use of the term "transgender" thus assumes the very conclusion at issue while eliding the absence of verification. This case is therefore materially distinct from *Martinsville*, 75 F.4th at 764–66, 773, and *Whitaker*, 858 F.3d at 1040, where courts credited

substantial evidence of enduring gender identity.[4] Here, no such evidence appears in the record, and the policy affirmatively dispenses with any requirement that it exist. (C.G. 2d Decl. ¶ 4). Defendants' failure to rebut these facts supports the conclusion that their policy lacks meaningful safeguards and disproportionately burdens female students.

Defendants' invocation of additional district-court authority does not alter this analysis, because the case on which they principally rely assumed—rather than examined—the very premise that is contested here.

Defendants' additional reliance on *F.F. v. Valley View Cmty Unit School District 365U*, No. 1:25-cv-09112 (N.D. Ill. Sept. 30, 2025) (*Valley View*), fares no better. (Resp. at 8–9, 15, 18). In denying a preliminary injunction in that case, Judge Coleman referred throughout her memorandum opinion to the male student at issue in that case as "transgender," notwithstanding the challenge to such characterization by the plaintiff in that case, F.F. (*Valley View*, ECF 27). The opinion acknowledged F.F.'s description of the male student as dressed in "male-typical clothing . . . with no visible indication of female identity," yet began its recitation of the facts by stating that F.F. "observed a transgender student" (*id*. at 2), and then proceeded on the assumption that the student was transgender. Although F.F. emphasized the absence of objective criteria or any consistent manifestation of a female gender identity, the court declined to require verification— such as medical documentation or enduring presentation—and instead treated F.F.'s evidence as impermissible "sex stereotyping." (*Id*. at 11, 13). That analytical move effectively assumed the disputed premise and therefore did not engage the core question presented here: whether a policy

---

[4] Ironically, though the irony appears lost on them, Defendants assail C.G. for insisting on something more than self-declared preferences by citing a "now-vacated" Seventh Circuit decision, which they nonetheless seem to think is still "rejecting" the notion of enduring gender identity. (Resp. at 12 n.2 (citing *D.P. by A.B. v. Mukwonago Area School District*, 140 F.4th 826, 833 (7th Cir. 2025), *vacated and reh'g granted*, 2025 WL 1794428, *appeal dismissed*, No. 23-2568 (7th Cir. Aug. 26, 2025)).

that permits access to female-only intimate spaces without articulated safeguards or objective standards operates as sex-based discrimination against biological females.

Defendants here nevertheless characterize the policy as "inclusive" and equally applicable. (Resp. at 8). In practice, however, it authorizes biological males to access girls' locker rooms based solely on asserted preference, without evidence of transgender status or consistent expression—as C.G.'s experience illustrates. (C.G. Decl. ¶ 3; C.G. 2d Decl. ¶ 4; Simeck Decl. ¶ 5). Defendants identify no written criteria contradicting this understanding. (See Simeck Decl. ¶ 7).

Such a policy is inherently sex-based. Allowing male access to female-only spaces denies girls privacy and safety and disregards the disparate harms imposed on them. Those harms are particularly acute in middle school, where intrusions into intimate spaces heighten the risk of humiliation and psychological injury. (Compl. ¶¶ 5–9; C.G. Decl. ¶¶ 7–11; Georgas Decl. ¶¶ 7–12). The policy cannot satisfy intermediate scrutiny, especially where readily available alternatives—such as single-occupancy facilities—could accommodate individual needs without invading girls' spaces. (Mot. at 2).

Defendants also emphasize that no other students have complained. (Resp. at 15; Simeck Decl. ¶ 16). But harm to a single student is sufficient. See *Whitaker*, 858 F.3d at 1051; *Mukwonago*, 140 F.4th at 828, *vacated and reh'g granted on other grounds*, 2025 WL 1794428, *appeal dismissed*, No. 23-2568 (7th Cir. Aug. 26, 2025). C.G.'s documented anxiety, nightmares, and eventual withdrawal from school amply meet that standard. (C.G. Decl. ¶¶ 4–11).

Moreover, the absence of complaints must be understood in context. The record reflects that girls who objected were summoned to administrators' offices, warned of discipline for "misgendering," and required to change clothes under supervision to ensure compliance. (Compl. ¶¶ 4, 25–27; Van Treese Decl. ¶¶ 10–12). Public meetings reflected strong support for the policy,

with dissenting voices marginalized. (Simeck Decl. ¶ 14). In such an environment, silence does not indicate consent.

Ultimately, Defendants articulate no objective criteria governing access to female-only spaces, confirming reliance on self-declaration alone. (See Resp. at 8–11). Their own accounts—describing an initial accommodation for bathroom use that escalated to locker-room access without verification—underscore the policy's ad hoc nature. (Simeck Decl. ¶¶ 5–6; Ford Decl. ¶ 6).

This improvised approach undermines both security and accountability. Without defined standards or tracking mechanisms, unauthorized intrusions cannot be meaningfully prevented. (*Cf.* Logemann Decl. ¶ 9). Nor do inadequate physical measures, such as limited privacy stalls, mitigate the resulting harms. (C.G. 2d Decl. ¶ 6). The accommodations offered to C.G., including excusing her from changing clothes for physical education, were reactive rather than principled. (Simeck Decl. ¶ 13).

Defendants argue that their policy complies with non-regulatory guidance from the Illinois State Board of Education and the Illinois Department of Human Rights, which they assert extends protections to "transgender, nonbinary, and gender nonconforming students." (Resp. at 8, 13, 19). Yet accommodating non-binary or gender-nonconforming identities—by definition rejecting consistent alignment with either binary sex—is the antithesis of the enduring, consistent gender expression required for meaningful transgender accommodation. Extending access to sex-segregated facilities on such fluid or non-binary grounds would effectively abolish those spaces altogether, as any student could invoke such an identity without verifiable commitment to one sex or the other. Regardless, such guidance cannot override the Equal Protection Clause or Title IX. (Mot. at 13–14).

Defendants further contend that Plaintiff's eight-month delay in seeking injunctive relief—from the February 2025 incidents until filing suit on November 1, 2025—undermines any claim of irreparable harm. (Resp. at 15). There has been no impermissible delay, however, because C.G. and her mother first sought resolution through direct communications with school officials in February and March 2025, pursued further accommodations over subsequent months, and resorted to litigation only after those efforts failed and the policy's continuing enforcement necessitated C.G.'s withdrawal in October 2025. Where, as here, constitutional violations produce ongoing harm and plaintiffs reasonably attempt informal resolution before suing, courts do not penalize such measured steps with denial of preliminary relief.

## III.    CONCLUSION

For the reasons set forth above and in Plaintiff's motion (ECF 18), this Court should grant a TRO and preliminary injunction prohibiting Defendants from allowing biological males to access girls' locker rooms and other girls-only facilities at the School based solely on self-declared preferences, pending establishment and publication of a policy with clear, objective criteria for verifying enduring gender identity. In the interim, such students should be accommodated in available single-occupancy facilities.

Dated: December 15, 2025                          Respectfully submitted,


/s/ Ajay Gupta
Ajay Gupta
The Law Offices of Ajay Gupta
2849 Bond Circle
Naperville, Illinois 60563
(630) 854-7194
ajguptaemail@gmail.com
N.D. Ill. Bar No. 190101

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, Ajay Gupta, an attorney, hereby state that on December 15, 2025, I electronically filed the foregoing document using the Court's CM/ECF Filing System, which will send electronic notice to all counsel of record.

/s/ Ajay Gupta
Ajay Gupta

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| C.G., a minor, by and through her<br>next friend and mother, NICOLE GEORGAS,<br><br>Plaintiff,<br><br>v.<br><br>DEERFIELD PUBLIC SCHOOLS DISTRICT 109, JOANNA FORD, in her official capacity as Assistant Superintendent for Student Services for Deerfield Public Schools District 109, and in her personal capacity, and CATHY VAN TREESE, in her official capacity as Associate Principal of Alan B. Shepard Middle School, and in her personal capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:25-cv-13406<br><br>Judge: Rebecca Pallmeyer |

**SECOND DECLARATION OF** ▮▮▮▮▮▮▮▮▮▮▮▮ **(C.G.)**
**IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

I, ▮▮▮▮▮▮▮▮▮ (C.G.), do hereby depose and state as follows:

1.     I am the Plaintiff in this action. I submit this second declaration in support of my complaint for declaratory and injunctive relief and monetary damages.

2.     I previously submitted a declaration, executed November 30, 2025, in support of Plaintiff's motion for a temporary restraining order and preliminary

1

injunction (ECF 18, Ex. 1), the contents of which I incorporate herein by this reference.

3. I have reviewed the declaration of Cathy Van Treese, executed December 9, 2025 (ECF 23, Ex. 2), and the declaration of Joanna Ford, executed December 8, 2025 (ECF 23, Ex. 3), both accompanying Defendants' response in opposition to Plaintiff's motion for a temporary restraining order and preliminary injunction (ECF 23).

4. I recognized the male student I encountered in the girls' locker room on February 24, 25, and 27, 2025, from my neighborhood. Prior to, and including on those three days, he consistently presented as male in all encounters.

5. In Paragraph 9 of her declaration, Van Treese asserts that on February 24, 2025, this male student "dropped . . . bag off in the cubby assigned." To my knowledge, no cubbies were ever assigned to students at that time.

6. The girls' locker room lacked sufficient private stalls to accommodate all female students changing at the same time. Consequently, most girls changed in the open area in between the rows of lockers.

7. On Tuesday, February 25, 2025, and Thursday, February 27, 2025, the male student was inside the girls' locker room and was accompanied by a teacher's assistant, Robin Tortella, who stood next to him, also inside the girls' locker room.

As a result, both the male student and Tortella were able to see female students changing clothes.

8. Contrary to what Van Treese says in Paragraph 12 of her declaration, and contrary to what Ford says in Paragraph 13 of her declaration, on February 25, 2025, neither Van Treese nor Ford stopped at the hallway located in front of the girls' locker room, but instead, both went inside, standing in the open area in between the rows of lockers, where the girls changed.

9. Again, on February 27, 2025, both Van Treese and Ford went well inside the girls' locker room, standing in the open area in between the rows of lockers, where the girls changed.

10. In any case, the open area in between the rows of lockers, where the girls changed, would have been clearly visible even from the hallway in front of the girls' locker room.

11. On February 25 and 27, 2025, Cathy Van Treese and Joanna Ford threatened me and other female students with disciplinary action if we refused to change clothes in the presence of the male student.

12. As a direct result of these events, I ceased changing clothes for physical education (PE) class. I continued to participate in PE while wearing my regular school clothes.

3

13.     Even though I participated in PE wearing my regular school clothes, I still had to enter the girls' locker room to drop off my bag, either in a cubby or on the floor by the cubbies. During such times, I often encountered the male student in the girls' locker room. I remained constantly apprehensive about seeing him there when he might be in a state of undress. Girls often walked to the area by the cubbies while in the middle of dressing to retrieve items from their bags.

14.     Participating in PE in regular clothes impaired my performance and negatively affected my overall school experience. Initially, only one other girl refused to change, and the two of us were the only ones participating in PE in regular clothes. But this girl then withdrew from the School, leaving me as the sole student participating in PE in regular clothes. This made me extremely self-conscious. Unwilling to change in the presence of the male student and embarrassed to be the only one in regular clothes during PE, I ultimately requested that my mother withdraw me from the School.

15.     In the weeks and months following the incidents of February 24–27, 2025, I observed marked changes in the male student's appearance. On some occasions, he wore clothing typically associated with girls and applied makeup. He even sported crop tops, which violated the female dress code. On other occasions, he dressed in "furry" attire, including donning some or all of the following for days at a

4

stretch: cat cuffs on his wrists; a collar on his neck; "paw boots" on his feet; and a long bushy tail at his waist dragging to the floor.

16. If assured that male students will no longer have access to the School's girls-only spaces, I would eagerly return to complete my education there. I would very much like to participate in the School's eighth-grade graduation this spring.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Deerfield, Illinois, on this, the 15th day of December, 2025.



(C.G.)