**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| C.G., a minor, by and through her<br>next friend and mother, NICOLE GEORGAS, | ) <br> ) <br> ) | |
| Plaintiff, | ) <br> ) | Case No.: 1:25-cv-13406 |
| v. | ) <br> ) | Judge: Pallmeyer |
| DEERFIELD PUBLIC SCHOOLS DISTRICT<br>109, JOANNA FORD, in her official capacity as<br>Assistant Superintendent for Student Services for<br>Deerfield Public Schools District 109, and<br>in her personal capacity, and<br>CATHY VAN TREESE, in her official capacity as<br>Associate Principal of Alan B. Shepard<br>Middle School, and in her personal capacity, | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Jury Demanded |
| Defendants. | ) | |

**<u>FIRST AMENDED COMPLAINT FOR</u>**
**<u>DECLARATORY AND INJUNCTIVE RELIEF</u>**
**<u>AND MONETARY DAMAGES</u>**

Plaintiff files this First Amended Complaint as a matter of course pursuant to

Federal Rule of Civil Procedure 15(a)(1), without leave of Court.

This First Amended Complaint substitutes Count V and includes conforming

revisions necessary to effect that substitution. All other allegations and claims

remain materially unchanged from the original Complaint.

## INTRODUCTION

1. Monday, February 24, 2025, began like any other recent school day in the life of C.G., then a thirteen-year-old female student at Alan B. Shepard Middle School in Deerfield, Illinois (the School). Too preoccupied with navigating the challenges of adolescence to dwell on the warmer-than-normal early spring weather when she had set off for school that day, C.G. found herself overdressed and looking forward to her physical education (PE) class, where she could get out of her regular clothes, change into her PE attire, and unwind and revel in the joy of fitness activity.

2. Talking animatedly with each other about how they had spent this past weekend, C.G. and her female classmates entered the girls' locker room to change for PE. Even before they could begin undressing, however, C.G. froze. Standing among the rows of lockers, in the space meant for girls, was a boy. C.G. knew him both from school and from her neighborhood—he lived across the street from her. Exactly like when C.G. had encountered this boy elsewhere earlier, here in the girls' locker room on this day, he was dressed like a male, talked like a male, looked like a male.

3. Confusion turned to discomfort; this was a place where C.G. and her female friends expected privacy, a sanctuary to change without fear of being seen. C.G. felt a knot of unease tighten in her stomach. She wasn't sure how to react, but her instincts told her that this wasn't right. Together with a few other girls, she made

a silent protest, refusing to change into her PE attire for so long as the male student remained in the locker room. The girls slipped on their athletic shoes but kept their regular clothes on, a small act of defiance to protect their dignity.

4.     The next day, February 25, 2025, things took a turn for the worse. Some of the girls who had protested the previous day were summoned to the office of the School's Associate Principal Cathy Van Treese, where their concerns were met not with understanding but with cold authority. Associate Principal Van Treese outright dismissed the girls' concerns about sharing the locker room with a male student. Instead of listening, she issued a chilling ultimatum: Change in front of the male student, or face discipline. Adding insult to injury, she accused the girls of "misgendering" the male student, weaponizing the school's so-called gender-inclusive policy to silence their discomfort.

5.     What followed was unimaginable. Later that day, February 25, 2025, Joanna Ford, Assistant Superintendent for Student Services at the School District, accompanied by Associate Principal Cathy Van Treese, along with other teachers, followed the girls into the locker room. There, they stood watch, their presence an unspoken demand. With the male student still there, C.G. and her classmates were coerced into changing their clothes. C.G. was made to strip down to her sports bra and underwear. Her heart pounded as she stood in the crowded, humid room, her privacy stripped away under the gaze of adults who should have protected her. The

air felt thick with shame and fear. These were not her usual PE teachers, not familiar faces who knew her, but strangers wielding their authority like a cudgel. C.G.'s cheeks burned with humiliation, her hands trembling as she tried to shield herself, her sense of safety eroding with every second.

6. On February 27, 2025, the nightmare seemed destined to repeat itself. The male student was still in the locker room, and the administrators were there again, supervising, ensuring compliance. C.G.'s fear reached a breaking point. She couldn't bear the thought of exposing herself again, not in front of the male student, not under the prying eyes of these adults. Her body screamed escape. Clutching her phone, she fled the locker room, her sneakers squeaking against the tiles as she ran to call her mother, Nicole Georgas. Through tears, she poured out her fear and humiliation, her voice shaking as she told her mother, "I can't do this. They're making me change in front of him."

7. Ms. Georgas' heart broke as she listened to her daughter's distress. C.G., usually so spirited, sounded like a shadow of herself, haunted by the violation of her privacy. The School's response served to only deepen the wound. Instead of addressing C.G.'s trauma or directing the male student to an available gender-neutral facility, the School's Principal, Rob Wegley, suggested that C.G. and any girls who were not comfortable undressing before a male student switch to a different PE class.

4

8. The trauma lingered for months afterwards. C.G., once eager to join her friends in PE, dreaded the locker room. Nightmares replaced her once-restful sleep, and the confidence she once carried dimmed under the weight of humiliation. She felt betrayed by the adults meant to protect her. The School District's policy, enforced with such callous disregard, transformed the School from a place of learning into a place of fear, robbing C.G. of her sense of security and dignity.

9. Unable to bring herself to change clothes and strip down to her undergarments in the presence of a male student, C.G. ceased changing into her PE clothes in the locker room. C.G.'s PE attendance suffered because of her loss of trust in school officials. Eventually, earlier this fall, effective October 14, 2025, her mother, Ms. Georgas, withdrew C.G. from the School and began homeschooling her.

10. Persistent inquiries on the part of Ms. Georgas have revealed a presumably orally formulated policy by the School District to strictly abide by so-called non-regulatory guidance from the State of Illinois on the issue. Rigorously adhering to the letter of that guidance, the School District directs the School to allow biological male students access to female-only spaces, including restrooms, locker rooms, changing rooms, and showers, without any objective assessment of gender dysphoria or even subjective manifestation of female identity, but based merely on a privately expressed preference.

11. The most reasonable and least intrusive accommodation of the handful of biological male students with self-declared non-conforming gender preferences would be to make available to them single-use gender-neutral spaces.

12. Eschewing this sensible remedy, the School and the School District have instead chosen one that abandons the inviolability of female-only spaces. They have insisted on accommodating male students with self-declared non-conforming gender preferences in multi-use sex-segregated spaces previously reserved for females. This amounts to discrimination against the female students because it denies them the use of secure sex-segregated spaces free from intrusion by males.

13. This discrimination is sex-based. The spaces that have been selected to accommodate biological male students with self-declared non-conforming gender preferences are the ones previously reserved for the exclusive use of female students. The sole criterion in selecting these spaces is that they were originally designated for the opposite sex. To put it another way, the sex of a space's original designees alone determines whether that space has now been, or will be, repurposed for accommodating male students with self-declared non-conforming gender preferences.

14. Indeed, the School District's policy confers on males with self-declared non-conforming gender preferences the optionality of choosing sex-segregated spaces aligned with either their biological sex or their self-declared gender

preference. This option is denied those female students whose gender identity conforms to their biological sex. Such female students are nonetheless compelled to share with biological males what should be secure sex-segregated spaces, and thus, are robbed of their comfort and dignity.

15.     Despite receiving over $1.5 million in federal funding last year, the School District hides behind non-regulatory guidance from the State of Illinois to deny over 230 female students at Alan B. Shepard Middle School restrooms, locker rooms, changing rooms, and showers that are secure from intrusion by biological males.

16.     In allowing biological males access to female-designated facilities based solely on self-declared gender preferences, absent any requirement for medical documentation or consistent gender expression, and in failing to offer single-use gender-neutral restrooms to these males as a reasonable alternative, the School District is treating female students differently based on their sex, without any compelling governmental interest or narrowly tailored means to justify such discrimination, thus violating the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

17.     Furthermore, the District's policy violates Title IX of the Education Amendments of 1972, Pub. L. No. 92-318, 86 Stat. 235 (June 23, 1972) (codified as amended at 20 U.S.C. §§ 1681–1688) (hereinafter, Title IX), which prohibits sex-

based discrimination in federally funded educational programs. By prioritizing the self-declared non-conforming gender preferences of a tiny minority of male students over the privacy and safety rights of female students, the School District fosters a hostile educational environment that impedes equal access to educational facilities.

18. In forcing C.G. to undress in front of a male on February 25, 2025, under threat of disciplinary action, the School District's Assistant Superintendent for Student Services, Joanna Ford, and the School's Associate Principal, Cathy Van Treese, each acted intentionally, engaging in extreme and outrageous conduct exceeding the bounds of decency, as a direct and proximate result of which C.G. suffered severe emotional distress.

19. In forcing C.G. to undress in front of a male on February 25, 2025, under threat of disciplinary action, the School District's Assistant Superintendent for Student Services, Joanna Ford, and the School's Associate Principal, Cathy Van Treese, each knowingly and intentionally subjected C.G. to a humiliating and invasive exposure, causing her severe psychological harm.

20. This action, brought on behalf of C.G., by and through her next friend and mother, Nicole Georgas, for declaratory and injunctive relief and monetary damages, seeks to compel the School District to adopt a policy that ensures safe facilities for the exclusive use of its female students, including C.G., while providing

single-use gender-neutral options for males with non-conforming gender preferences, and to compensate C.G. for the injuries suffered by her.

**PARTIES**

21.     Plaintiff C.G., now a fourteen-year-old female homeschooled student, was, until October 14, 2025, enrolled at Alan B. Shepard Middle School in Deerfield, Illinois. She brings this action by and through her next friend and mother, Nicole Georgas, pursuant to Federal Rule of Civil Procedure 17(c).

22.     Ms. Georgas, as next friend, represents C.G.'s interests and seeks to protect her right to a safe and equitable educational environment.

23.     The Defendant School District is a political subdivision of the State of Illinois, responsible for operating and supervising public schools, including Alan B. Shepard Middle School in Deerfield, Illinois, pursuant to various laws of the State of Illinois, including but not limited to the Illinois School Code, 105 ILCS 5/10-1 *et seq*. The School District is empowered to establish policies for the effective operation of its schools, including the policy challenged herein. The School District's principal offices are located in Deerfield, Illinois. The School District is a recipient of substantial federal financial assistance. For fiscal year 2023, about 2.4 percent of the School District's total revenue of approximately $64 million,

amounting to some $1.5 million, consisted of federal funding.[1] As such, the School District is subject to Title IX. It is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983.

24.     Defendant Joanna Ford is the Assistant Superintendent for Student Services at the School District, with authority and responsibility for the administration and management of schools, including Alan B. Shepard Middle School, pursuant to 105 ILCS 5/10-21.4. Ford enforces the School District's policies, including the policy at issue here. She is sued in both her official and personal capacities, and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983.

25.     Defendant Cathy Van Treese is the Associate Principal of Alan B. Shepard Middle School, with delegated authority and responsibility for its administration pursuant to 105 ILCS 5/10-21.4a. Van Treese enforces the School District's policies, including the policy at issue here, under the supervision of School District officials, including Defendant Ford. She is sued in both her official and personal capacities, and is a "person" acting under color of state law within the meaning of 42 U.S.C. § 1983.

---

[1] Ill. State Bd. of Educ., Ill. Rep. Card, Deerfield SD 109, District Finances: Revenue Percentages, https://www.illinoisreportcard.com/District.aspx?source=environment&source2=revenuepercent ages&Districtid=34049109002 (last visited Nov. 1, 2025).

26.     Defendants are responsible for the policy that permits biological male students to use the School's female-only spaces, instead of offering these male students the less intrusive alternative of single-use gender-neutral spaces, causing harm to C.G. and similarly situated students. Each individual Defendant, and those under their supervision, direction, or control, has intentionally performed, participated in, or abetted the acts alleged herein and will continue to cause irreparable harm unless enjoined.

## JURISDICTION AND VENUE

27.     This action arises under 42 U.S.C. § 1983 to redress deprivations of rights secured by the Equal Protection Clause of the Fourteenth Amendment, Title IX, and the Free Speech Clause of the First Amendment.

28.     This Court has original jurisdiction over the claims in Counts I, II, and III pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) and (4) (civil rights jurisdiction). This Court has supplemental jurisdiction over the state law claim in Counts IV and V pursuant to 28 U.S.C. § 1367, as they form part of the same case or controversy as the claims in Counts I–III.

29.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside in this judicial district, and a substantial part of the events giving rise to Plaintiff's claims occurred within this district.

30. This Court has authority to issue declaratory and injunctive relief pursuant to Federal Rules of Civil Procedure 57 and 65 and 28 U.S.C. §§ 2201 and 2202, and pursuant to its inherent equitable powers.

31. This Court has personal jurisdiction over Defendants because they are domiciled in Illinois.

**FACTUAL ALLEGATIONS**

32. On February 24, 2025, Plaintiff C.G., a then-thirteen-year-old female student at Alan B. Shepard Middle School in Deerfield, Illinois, arrived at school anticipating her physical education (PE) class, where she typically enjoyed the opportunity to change into her PE attire and engage in fitness activities with her classmates.

33. On that day, C.G. and her female classmates entered the girls' locker room to prepare for PE class. Upon entering, C.G. observed a male student, known to her from both school and her neighborhood, present in the locker room, a space designated exclusively for female students.

34. The male student presented as male in appearance, dress, and speech, causing C.G. immediate confusion and discomfort, as the girls' locker room was

intended to be a private sanctuary for female students to change without being observed.

35. Feeling uneasy and believing the presence of a male student in the locker room was inappropriate, C.G., along with several other female students, protested by refusing to change into their PE uniforms while the male student remained present, though they changed into their athletic shoes to maintain some participation in the class.

36. On February 25, 2025, some of the protesting female students were summoned to the office of Defendant Cathy Van Treese, Associate Principal of Alan B. Shepard Middle School.

37. Rather than addressing the girls' concerns about the male student's presence in the locker room, Defendant Van Treese dismissed their objections, accused them of "misgendering" the male student, and threatened them with disciplinary action if they did not change in front of the male student, invoking the school's gender-inclusive policy.

38. Later, on February 25, 2025, Defendants Joanna Ford, Assistant Superintendent for Student Services at Deerfield Public Schools District 109, Cathy Van Treese, and several other teachers entered the girls' locker room, where the male

student was still present, and coerced C.G. and her classmates to change their clothes under their supervision.

39. Under this pressure, C.G. was forced to undress to her sports bra and underwear in the presence of the male student and the adult administrators, none of whom were her regular PE teachers, causing her profound humiliation, fear, and a loss of personal safety.

40. On February 27, 2025, the male student remained in the girls' locker room, and Defendants Ford and Van Treese again supervised the changing process, reinforcing their demand for compliance.

41. Overwhelmed by fear and unable to endure further exposure, C.G. fled the locker room, contacted her mother, Plaintiff's next friend Nicole Georgas, and tearfully recounted the humiliation and distress she endured in being forced to change in front of the male student and adult administrators.

42. In response, Defendant Rob Wegley, Principal of Alan B. Shepard Middle School, proposed that C.G. and other female students uncomfortable with the male student's presence switch to a different PE class, rather than directing the male student to use an available gender-neutral facility, effectively penalizing C.G. for her objections.

43. As a consequence of these events, C.G. ceased changing her clothes in the locker room due to the fear of changing in the presence of a male student under

the threat of discipline, and her PE attendance suffered because of her loss of trust in school officials.

44. Plaintiff's next friend Nicole Georgas's inquiries revealed that Deerfield Public Schools District 109 adheres to a policy, based on non-regulatory guidance from the State of Illinois, that permits biological male students to access female-only spaces, including restrooms, locker rooms, changing rooms, and showers, based solely on their self-declared gender preference, without requiring medical documentation or consistent gender expression.

45. Despite the availability of single-use gender-neutral facilities, Defendants have chosen to accommodate male students with self-declared non-conforming gender preferences in multi-use female-designated spaces, disregarding the privacy and safety of female students like C.G.

46. This policy discriminates against female students by denying them secure, sex-segregated spaces free from intrusion by biological males, solely because these spaces were originally designated for females.

47. The policy grants biological males with self-declared non-conforming gender preferences the option to choose between sex-segregated spaces aligned with their biological sex or their self-declared gender preference, an option not afforded

female students like C.G., who are compelled to share female-designated spaces with biological males.

48. Deerfield Public Schools District 109 received approximately $1.5 million in federal funding in fiscal year 2023, constituting about 2.4 percent of its $64 million total revenue, subjecting it to the requirements of Title IX of the Education Amendments of 1972.

49. By prioritizing the self-declared gender preferences of biological male students over the privacy and safety of female students, Defendants' policy creates a hostile educational environment that impedes C.G.'s equal access to educational facilities.

50. The actions of Defendants Ford and Van Treese on February 25, 2025, in forcing C.G. to undress in front of a male student under threat of disciplinary action, were intentional and caused C.G. severe emotional distress and psychological harm.

51. C.G. suffered ongoing trauma, including nightmares, a loss of confidence, and a pervasive fear of the locker room, transforming her school experience from one of learning and joy to one of dread and insecurity. As a direct consequence of this ongoing harm, effective October 14, 2025, C.G.'s mother withdrew C.G. from the School and began homeschooling her.

## CLAIMS FOR RELIEF

## COUNT I

### Denial of Equal Protection
### U.S. Const. Amend. XIV
### (Against All Defendants)

52. Plaintiff incorporates paragraphs 1 through 51 as though fully set forth herein.

53. Defendants' policy of allowing male students access to the School's female-only spaces based solely on these male students' self-declared non-conforming gender preferences treats such students differently than female students, who are consequently subjected to privacy violations in sex-segregated spaces aligned with their biological sex.

54. This policy discriminates on the basis of sex by allowing male students to choose between male and female sex-segregated spaces according to, alternatively, their biological sex or self-declared gender preferences. In sharp contrast, female students, like C.G., are denied the choice to access female-only spaces free from males, depriving them of privacy, diminishing their safety, and exposing them to shame.

55. The Equal Protection Clause bars discrimination based on sex, which encompasses policies disproportionately harming one sex, such as the School

District's policy at issue here that compromises the privacy and sense of security of female students in nominally sex-segregated facilities.

56. The policy is not narrowly tailored to a compelling government interest. While accommodating male students' gender identity may be a legitimate interest, the policy fails to balance this interest with the privacy and safety rights of female students, as evidenced by the failure to offer single-use gender-neutral facilities to accommodate the self-declared gender preferences of male students.

57. The policy stigmatizes female students by forcing them to either endure privacy violations or seek burdensome alternatives, branding them as less entitled to safe and equitable facilities. This violates their right to equal protection under the Fourteenth Amendment.

58. Any affirmative defense of the policy based on Defendants' interpretation of the requirements of the Illinois Human Rights Act, 775 ILCS 5/5-101 *et seq.*, is untenable because state law cannot excuse violations of the Equal Protection Clause. In any case, IDHR's non-regulatory guidance, which lacks the force of law, cannot mandate that the School District prioritize self-declared gender preferences over the privacy rights of female students.

59. Defendants, acting under color of state law, subjected C.G. to disparate treatment by enforcing a policy that permitted a male student to use female-

designated spaces, disregarding her privacy interests as a female student, while offering no comparable intrusion on male students' privacy.

60. Defendants' actions lacked a legitimate governmental purpose and were not substantially related to any important governmental interest, given that available gender-neutral facilities were not utilized.

61. Defendants' coercion of C.G. to change in front of adult administrators and a male student further discriminated against her on the basis of sex, creating a hostile environment and violating her right to bodily privacy.

62. As a direct and proximate result of Defendants' violation of the Equal Protection Clause, C.G. suffered emotional distress, humiliation, and deprivation of her constitutional rights.

## COUNT II

### Violation of Title IX
### 20 U.S.C. § 1681–1688
### (Against Defendant School District)

63. Plaintiff incorporates paragraphs 1 through 51 as though fully set forth herein.

64. Title IX provides that no person shall, on the basis of sex, be excluded from participation in, denied the benefits of, or subjected to discrimination under any education program receiving federal financial assistance.

65. The School District is a recipient of federal financial assistance and is subject to Title IX.

66. The School District's policy creates a hostile educational environment by subjecting female students to the constant risk of encountering males in supposedly female-only restrooms, locker rooms, and showers, causing pervasive anxiety, humiliation, distress, and disruption of their education, as exemplified by C.G.'s behavior of refusing to change for PE classes in the locker room.

67. The policy denies C.G. and similarly situated students the benefits of a safe and equitable educational environment, forcing them to avoid restrooms, miss instruction, coaching, or practice time to access single-use staff facilities, or endure anxiety and discomfort, which impairs their ability to focus on education.

68. The School District's failure to implement adequate alternatives, such as accessible single-use gender-neutral options, constitutes intentional discrimination under Title IX.

69. Any affirmative defense of the School District's failure to comply with Title IX based on its interpretation of the requirements of the Illinois Human Rights Act, 775 ILCS 5/5-101 *et seq.*, is untenable because state law cannot excuse violations of Title IX. In any case, IDHR's non-regulatory guidance, which lacks the force of law, cannot mandate that the School District prioritize self-declared gender preferences over the privacy rights of female students.

70. The School District subjected C.G. to sex-based discrimination by enforcing a policy that allowed a male student to use the girls' locker room, disregarding her privacy and safety.

71. The School District retaliated against C.G. for protesting the policy, including threatening discipline and coercing exposure in the locker room, creating a hostile educational environment based on sex.

72. The School District had actual notice of the policy's discriminatory impact and failed to take corrective action, despite the availability of gender-neutral facilities.

73. As a direct and proximate result, C.G. was deprived of equal access to educational opportunities and suffered severe emotional distress.

## COUNT III

### Denial of Free Speech
### U.S. Const. Amend. I
### (Against Defendants Ford and Van Treese)

74. Plaintiff incorporates paragraphs 1 through 51 as though fully set forth herein.

75. The First Amendment to the United States Constitution, enforceable against Defendants through 42 U.S.C. § 1983, protects C.G.'s right to free speech, including her right to express objections to school policies without fear of retaliation.

76. On February 24, 2025, C.G. engaged in protected speech by refusing to change into her PE attire in the girls' locker room while a male student was present, expressing her discomfort with the school's gender-inclusive policy that permitted biological males to access female-designated spaces.

77. C.G.'s protest did not materially or substantially disrupt school operations or cause substantial disorder, as she and her classmates changed into athletic shoes and otherwise complied with PE class requirements, making their actions constitutionally protected.

78. Defendants Joanna Ford and Cathy Van Treese, acting under color of state law, retaliated against C.G. for her protected speech by:

a.      Entering the girls' locker room on February 25, 2025, and threatening disciplinary action against C.G. for refusing to change in front of the male student and for allegedly "misgendering" him;

b.      Following those threats, on the same day, February 25, 2025, coercing C.G. to undress to her sports bra and underwear in the presence of the male student and themselves, using their authority to intimidate her into compliance;

c.      Continuing to supervise the locker room on February 27, 2025, to enforce C.G.'s compliance with the policy, causing her to flee in distress; and

d.      Proposing, through the School's Principal, Rob Wegley, that C.G. switch to a different PE class, effectively punishing her for her objections rather than addressing the policy's impact.

79.      Defendants' actions were motivated by C.G.'s protected expression of discomfort with the school's policy and were intended to chill her speech and deter further objections.

80.      As a direct and proximate result of Defendants' retaliatory actions, C.G. suffered severe emotional distress, humiliation, and a loss of educational opportunities, including her decision to refuse to change in the locker room for her PE classes, which she previously enjoyed, and eventually, her mother's decision to withdraw C.G. from the School and homeschool her.

## COUNT IV

### Intentional Infliction of Emotional Distress
### (Illinois State Law)
### (Against Defendants Ford and Van Treese)

81. Plaintiff incorporates paragraphs 1 through 51 as though fully set forth herein.

82. Under Illinois law, intentional infliction of emotional distress (IIED) occurs when a defendant engages in extreme and outrageous conduct, intentionally or recklessly causing severe emotional distress to the Plaintiff.

83. Defendants Joanna Ford and Cathy Van Treese engaged in extreme and outrageous conduct by:

a. Threatening C.G., a then-thirteen-year-old minor, with disciplinary action on February 25, 2025, for expressing discomfort with changing in front of a male student in the girls' locker room;

b. Entering the girls' locker room on February 25, 2025, and coercing C.G. to undress to her sports bra and underwear in the presence of a male student and themselves, despite knowing her objections and the availability of a gender-neutral facility; and

c. Repeating their supervision of the locker room on February 27, 2025, further intimidating C.G. and causing her to flee in distress.

84. Defendants' conduct was intentional and reckless, exploiting their positions of authority over C.G., a minor, to force her into a humiliating and traumatic situation that no reasonable person, particularly a child, could be expected to endure.

85. Defendants' actions were particularly egregious given their awareness of C.G.'s discomfort and the availability of a less intrusive alternative, namely directing the male student to a gender-neutral facility.

86. As a direct and proximate result of Defendants' conduct, C.G. suffered severe emotional distress, manifested by nightmares, a loss of confidence, fear of the locker room—as reflected in her refusal to change there for PE classes—and culminating in her mother's termination of C.G.'s enrollment at the School and homeschooling her instead.

87. Defendants' conduct was willful and wanton, warranting monetary damages to deter similar acts in the future.

## COUNT V

### Intrusion Upon Seclusion
### (Illinois State Law)
### (Against Defendants Ford and Van Treese)

88.    Plaintiff incorporates paragraphs 1 through 51 as though fully set forth herein.

89.    Illinois common law recognizes a cause of action for intrusion upon seclusion where a defendant intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or her private affairs, in a manner that would be highly offensive to a reasonable person.

90.    At all relevant times, C.G. was a minor female student with a reasonable and well-established expectation of privacy in the girls' locker room at her public school, a space designated for private changing and bodily exposure among female students.

91.    On February 25, 2025, Defendants Joanna Ford and Cathy Van Treese, acting under color of state authority and exercising disciplinary control over C.G., intentionally intruded upon her seclusion and private affairs by compelling her, under threat of discipline and under adult supervision, to remove her clothing to her underwear in the girls' locker room in the presence of a biological male student.

92. Defendants' intrusion was intentional and direct, and was accomplished through the use of coercive authority, threats of punishment, and enforcement of compliance in a confined, intimate setting where C.G. had no meaningful ability to avoid the intrusion.

93. The intrusion concerned C.G.'s body, bodily privacy, and personal dignity, and occurred in a context involving partial nudity and heightened vulnerability, particularly given her status as a minor.

94. Defendants' conduct would be highly offensive to a reasonable person, especially to a reasonable minor student, because it forced C.G. to expose her body in a private space under compulsion, disregarded her expressed objections, and violated the fundamental expectation of privacy associated with locker-room changing areas.

95. As a direct and proximate result of Defendants' intrusion upon her seclusion, C.G. suffered severe emotional distress, humiliation, fear, and lasting psychological harm, including anxiety associated with changing for physical education, loss of trust in school officials, and withdrawal from the school environment.

96. Defendants' conduct was willful and wanton, demonstrated a conscious disregard for C.G.'s privacy rights and emotional well-being, and warrants the imposition of compensatory damages and punitive damages.

# PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court:

A.     Issue a preliminary and permanent injunction enjoining Defendants from enforcing the policy allowing biological males access to girls' locker rooms and restrooms and from retaliating against students for expressing objections to such policies;

B.     Declare Defendants' actions in violation of the Equal Protection Clause, Title IX, the First Amendment, and Illinois state law;

C.     Award compensatory damages to C.G. for emotional distress and psychological harm in an amount to be determined at trial;

D.     Award punitive damages against the individual Defendants for their willful and wanton conduct;

E.     Award Plaintiff reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and 20 U.S.C. § 1681; and

F.     Grant such other and further relief as the Court deems just and proper.

# DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 5, 2026                    Respectfully submitted,

                                          /s/Ajay Gupta
                                          Ajay Gupta
                                          2849 Bond Circle
                                          Naperville, Illinois 60563
                                          (630) 854-7194
                                          ajguptaemail@gmail.com
                                          N.D. Ill. Bar No. 190101
                                          *Counsel for Plaintiff*