**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **C.G., a minor by and through her next friend and mother, NICOLE GEORGAS,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 1:25-cv-13406** |
| **v.** | ) | |
| | ) | **Judge Rebecca R. Pallmeyer** |
| **DEERFIELD PUBLIC SCHOOLS DISTRICT 109; JOANNA FORD, and CATHY VAN TREESE,** | ) | |
| **Defendant.** | | |

**MEMORANDUM OPINION AND ORDER**

Alan B. Shepard Middle School ("Shepard"), a school in the Deerfield Public Schools District 109, adheres to Illinois non-regulatory guidance stating that students should be permitted to use facilities in the school that align with their gender identities. C.G., a student at Shepard, along with a few of her other classmates, objected to changing into gym clothes while in the presence of ger transgender female classmate in the girl's locker room. C.G. alleges that school officials, including Defendants Joanna Ford and Cathy Van Treese, threatened discipline and supervised the girl's locker room to ensure compliance with the school's gender-inclusive policies. Plaintiffs, C.G. and her mother, allege that these actions by school officials, and Shepard's adherence to Illinois gender-inclusive policies regarding the use of school facilities, violated her constitutional rights under the Equal Protection Clause and the First Amendment, as well as her statutory rights under Title IX. She also brings Illinois state tort claims against the individual Defendants. Defendants have moved to dismiss C.G.'s complaint. As explained here, the motions are granted and the complaint is dismissed without prejudice.

## BACKGROUND

### I. Factual Background

On February 24, 2025, C.G.—a then-thirteen-year-old female student at Alan B. Shepard Middle School ("Shepard") in Deerfield, Illinois—entered the girl's locker room to change for her physical education ("PE") class. (Am. Compl. [37] ¶ 2.) Before she began to undress, C.G. recognized a transgender female student, described in her complaint as "a boy," whom she recognized from school and from her neighborhood. (*Id.*) Throughout this opinion, the court refers to this student as "Student B." C.G. alleges that on this day in the girl's locker room, Student B was "dressed like a male, talked like a male, looked like a male," similar to her previous encounters with the student. (*Id.*) Due to discomfort with changing in front of Student B, C.G. and several of her classmates "made a silent protest," and refused to change into their PE attire; they instead "slipped on their athletic shoes but kept their regular clothes on." (*Id.* ¶ 3.)

The next day, on February 25, 2025, "[s]ome of the girls who had protested the previous day, were summoned to the office of the [s]chool's Associate Principal Cathy Van Treese." (*Id.* ¶ 4.) (Whether C.G. was among the students summoned to Van Treese's office is not clear from the complaint.) Plaintiffs assert that Van Treese conveyed an "ultimatum" to the students who were summoned to her office: "[c]hange in front of the male student, or face discipline." (*Id.*) She also allegedly "accused the girls of 'misgendering'" their classmate. (*Id.*)

Later that same day, Joanna Ford, Assistant Superintendent for Student Services at the School District, as well as Van Treese and other (unnamed) teachers, entered the girl's locker room and "stood watch" while the girls changed for PE. (*Id.* ¶ 5.) C.G. alleges that these administrators and teachers "coerced" her and her classmates into changing their clothes in front of Student B, evidently merely by being present in the locker room. (*Id.*) C.G. alleges that she was forced to strip down to her undergarments in front of these adults and Student B. (*Id.* ¶ 5.)

Two days later, on February 27, 2025, "the administrators were [in the locker room] again, supervising" and "ensuring compliance." (*Id.* ¶ 6.) At this point, "C.G.'s fear reached a breaking

point." (*Id.*) She "fled the locker room" with her phone and called her mother, Nicole Georgas. (*Id.*) On the phone, she told her mother: "I can't do this. They're making me change in front of him." (*Id.*)

C.G. alleges that "[i]n response,"—it is unclear from the complaint in response to what—Shepard's Principal, Rob Wegley, proposed that "C.G. and other female students uncomfortable with the male student's presence switch to a different PE class, rather than directing the male student to use an available gender-neutral facility." (*Id.* ¶ 42.) C.G. remained uncomfortable, and she "ceased changing into her PE clothes in the locker room." (*Id.* ¶ 9.) Her attendance in PE suffered, which she attributes to "her loss of trust in school officials." (*Id.*) In October 2025, C.G.'s mother withdrew her from the school and began homeschooling her. (*Id.*) These events have resulted in "severe psychological harm," according to C.G., including "nightmares," "trauma" and "humiliation." (*Id.* ¶¶ 19, 8.)

Further investigation by Ms. Georgas revealed that Shepard has a policy of "abid[ing] by so-called non-regulatory guidance from the State of Illinois on the issue." (*Id.* ¶ 10.) Plaintiffs allege that, evidently "[r]igorously adhering to the letter of that guidance," the School District directs that Shepard "allow biological male students access to female-only spaces, including restrooms, locker rooms, changing rooms, and showers, without any objective assessment of gender dysphoria or even subjective manifestation of female identity, but based merely on a privately expressed preference." (*Id.*) C.G. does not include the exact language of this "non-regulatory guidance" in her complaint—that language was instead provided by the District in its motion to dismiss[1]:

---

[1] The court may properly consider the language of this guidance because it was submitted by the District in its motion to dismiss and is explicitly "referred to in and integral to" C.G.'s complaint. *Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO v. Barrington Excavating, LLC*, No. 23 C 15257, 2024 WL 3888902, at *2 n.1 (N.D. Ill. Aug. 21, 2024) (citing *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 878 (7th Cir. 2017); (*See, e.g.*, Am. Compl. [37] ¶¶ 8, 10, 14, 15, 47) The court may also consider the policy because it is a public record. *See Fosnight v. Jones*, 41 F.4th 916, 922 (7th Cir. 2022) (explaining that a court "may take judicial notice of matters of public record when ruling on a motion to dismiss").

> The District's policy and its implementation are consistent with guidance from the State of Illinois. [] According to the Illinois Department of Human Rights ("IDHR"), "[a] student must be permitted to access restrooms or bathrooms, locker rooms, and changing rooms that align with their gender-related identity and without having to provide documentation or other proof of gender."[2] The guidance issued by the Illinois State Board of Education ("ISBE") similarly provides that "students must be allowed to use the facilities that correspond with their gender identity."[3]

(Dist. Mem. [39] at 2–3.). In her opposition to the District's motion to dismiss, C.G. does not challenge Defendants' assertion that these policies are the state non-regulatory guidance referred to in her complaint. (*See* Opp'n [42].) This lawsuit resulted.

## II. Procedural History

C.G., through her mother, Ms. Georgas, filed her initial complaint on November 1, 2025, alleging federal constitutional violations, state torts, and violations of Illinois state law. One month later, on December 1, 2025, C.G. sought a temporary restraining order and preliminary injunction against the District's enforcement of its policy. (Mot. for TRO and Prelim. Inj. [18].) All Defendants opposed the motion ([22], [24]), and on December 18, 2025, the court denied it, concluding that C.G. lacked standing to injunctive relief: she "face[d] no 'real and immediate threat' of future harm" because she was no longer enrolled at Shepard, and were she to reenroll, C.G.'s PE class was no longer the same as Student B's, and no transgender girl in C.G.'s PE class used the girl's locker room. (Order [28].) C.G. promptly appealed the court's order to the Seventh Circuit. (Notice of Appeal [29].)

Meantime, on January 5, 2026, C.G. filed her First Amended (and now-operative) Complaint. Therein, C.G. alleges that the District—in its adherence to IDHR and ISBE guidance—

---

[2] IDHR, Non-Regulatory Guidance, Relating to Protection of Transgender, Nonbinary, and Gender Nonconforming Students Under the Illinois Human Rights Act (Dec. 2021) at 6, https://dhr.illinois.gov/content/dam/soi/en/web/dhr/publications/documents/idhr-guidance-relating-toprotection-of-transgender-nonbinary-and-gender-nonconforming-students-eng-web.pdf.

[3] ISBE, Non-Regulatory Guidance, Supporting Transgender, Nonbinary, and Gender Nonconforming Students (March 1, 2020) at 10, https://www.isbe.net/Documents/ISBE-Guidance-Supporting-Transgender-Nonbinary-Gender-Nonconforming-Students.pdf.

violated the Equal Protection Clause, U.S. Const. amend XIV, and Title IX, 20 U.S.C. §§ 1681–1688. She brings her Equal Protection claim against all Defendants (Count I) and her Title IX claim against the District alone (Count II). She also brings specific claims against two administrators—Ford and Van Treese, both in their official and individual capacities—for First Amendment retaliation, U.S. Const. amend I, (Count III), as well as the state torts of Intentional Infliction of Emotional Distress (Count IV) and Intrusion Upon Seclusion (Count V). All Defendants moved to dismiss the complaint ([39], [40]), and those motions are fully briefed before the court.

Appellate briefing on the preliminary injunction continued in tandem. In response to C.G.'s opening brief on appeal, Defendants argued that there was a "real possibility that this case will become moot before any injunction could issue," because "[e]ighth-grade graduation at Shepard Middle School is set for June 2, 2026," and "[a]ny injunction issued after that date cannot possibly affect her rights." (Brief for Defendants-Appellees, No. 25-3282, at17 n.11, Dkt. No. 9.) Apparently in response to this argument by Defendants, on April 19, 2026, C.G. filed a motion to expedite the appeal or, in the alternative, decide the appeal without oral argument. She contended that she had "sought to preserve a live controversy" by "pursuing class-wide relief in the district court." (Plaintiff-Appellant's Motion to Expedite Appeal, No. 25-3282, at 3, Dkt. No. 13.) This "diligent pursuit" consisted of her filing, in this court, a motion to amend her complaint to add class allegations and for class certification the same day, April 19, 2026. That motion has been fully briefed and argued by the parties.

## <u>DISCUSSION</u>

### I. Motion to Dismiss

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(b)(6); *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive, a complaint must "state a claim to relief that is plausible on its face." *Flores v. City of S. Bend*, 997 F.3d 725, 728–29 (7th Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). A claim is considered plausible if "the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (2009). "[D]etailed factual allegations" are not required, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Still, the court must "accept[] as true all well-pleaded facts and draw[] all reasonable inferences in favor of the non-moving party." *Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018).

**A. Equal Protection Claim**

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Clause prohibits intentional and arbitrary discrimination, specifically by prohibiting state and local governments from discriminating on the basis of certain protected classifications. Sex-based classifications are therefore subjected to "intermediate scrutiny" under equal protection analysis: "the State must show that the 'classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" *United States v. Skrmetti*, 145 S. Ct. 1816, 1828–29 (2025) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)). Where a law does not differentiate based on a protected classification, but instead differentiates on other, non-protected classifications, the law is subject to rational basis review. *Id.* at 511. Under this standard, the court "will uphold a statutory classification so long as there is 'any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *Id.* at 522.

Because the Equal Protection Clause does not include a private right of action, the court presumes that Plaintiff brings her claim under 28 U.S.C. § 1983. *St. Joan Antida High Sch. Inc. v. Milwaukee Pub. Sch. Dist.*, 919 F.3d 1003, 1008 (7th Cir. 2019) ("Although the Equal Protection Clause does not endow a private right of action, 42 U.S.C. § 1983 does for any constitutional deprivation under color of state law."). To plausibly allege a 1983 claim against the District—a local government body—C.G. must satisfy the standard outlined in *Monell v. Dep't of Social*

*Services of City of New York*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978): the constitutional act complained of must be caused by (1) an official policy; (2) a practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). Liability against individual state agents depends on the capacity in which they are sued. "Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Zimny v. Geneva Cmty. Unit Sch. Dist. 304*, 718 F. Supp. 3d 766, 792 (N.D. Ill. 2024) (quoting *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008)). On the other hand, "[a]n individual capacity suit requires a showing of personal involvement by the government actor." *Rodgers v. Dart*, No. 11-CV-5118, 2014 WL 1227254, at *4 (N.D. Ill. Mar. 25, 2014).

Defendants argue that C.G.'s Equal Protection claim fails because the district's policy "contains *no classification whatsoever*" that would trigger heightened scrutiny. (District Mem. [39] at 9.) The court agrees. In another case brought by C.G.'s counsel, *F.F. v. Valley View Cmty. Unit Sch. Dist. 365U*, No. 1:25-CV-09112, 2026 WL 2017805 (N.D. Ill. July 13, 2026), another court in this district considered and rejected an Equal Protection Claim challenging precisely the same guidance and policies at issue here. Judge Coleman reasoned that because "[s]ex-based discrimination turns on whether conduct is permitted for one sex that is denied for another," the challenged gender-neutral policy could not be subject to heightened review. *Valley View*, 2026 WL 2017805, at *5 (citing *Skrmetti*, 145 S. Ct. 1816 (2025)):

> Plaintiff cannot claim that a policy that treats the sexes identically, discriminates on the basis of sex. As alleged in her Complaint, the District follows the IDHR's guidance on bathroom access, which confirms "[a] student must be permitted to access the restrooms or bathrooms, locker rooms and changing rooms that align with their gender identity." (Dkt. 1 at *14.) Thus, on its face, the School's Policy allows all students, regardless of their sex, access to the bathroom that aligned with their gender-identity. All students, Plaintiff included, are allowed access to the restroom that aligns with their gender identity, not just transgender girls; any other interpretation would ignore the fact that transgender boys, cisgender boys, cisgender girls, and gender nonconforming students are all guaranteed the same accommodations as transgender girls. Plaintiff fails to overcome the clear implication that all sexes are treated equally under the policy, and are given the exact same bathroom access.

*Id.* The same reasoning applies here, where C.G. alleges Equal Protection violations based on the school's gender-neutral locker-room policy. C.G. therefore challenges a policy that does not contain classifications, protected or otherwise. Because the policy permits all students, without distinction between sexes, to use the locker room that aligns with their gender identity, C.G.'s Equal Protection Claim against all Defendants fails. *United States v. Williams*, No. 02 C 4990, 2003 WL 21384640, at *4 (N.D. Ill. June 12, 2003) ("Even the deferential 'rational basis' scrutiny that is applied to ordinary government classifications is not appropriate when the challenged law creates no classifications." (citing *McCoy v. Richards,* 771 F.2d 1108, 1112 (7th Cir.1985)).

Count I is dismissed against all Defendants.

**B. Title IX**

Title IX provides that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Plaintiff alleges that the District creates a hostile educational environment by "subjecting female students to the constant risk of encountering males in supposedly female-only restrooms, locker rooms, and showers, causing pervasive anxiety, humiliation, distress, and disruption of their education." (Am. Compl. [37] ¶ 66.) A hostile-environment claim under Title IX requires allegations that conduct is severe, pervasive, and objectively offensive such that it denies equal educational access. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Like her Equal Protection claim, C.G.'s Title IX claim fails because she has failed to allege any sex-based discrimination: the District's policy allows equal access for students to all facilities that align with their gender preferences, and C.G. has not been excluded from participation in or denied the benefit of education via the District's gender-inclusive policy. *Valley View*, 2026 WL 2017805, at *7 ("Plaintiff has not shown that Defendants' policy violates Title IX since its policy guarantees all students equal rights provided under the statute.") To the extent her hostile environment Title IX claim relies on a violation of her privacy rights, the Seventh Circuit considered

and rejected similar concerns in *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034 (7th Cir. 2017), a case considering the mirror-image of the issues here: in that case, a transgender student denied access to the bathroom that aligned with his gender identity brought Equal Protection and Title IX claims. *Id.* at 1038–1039, *abrogated on other grounds as recognized by Ill. Republican Party v. Pritzker*, 973 F.3d 760, 762 (7th Cir. 2020). The Seventh Circuit affirmed the district court's grant of a preliminary injunction, finding that the plaintiff's Title IX claim was likely to succeed on the merits: in other words, the policy of denying the plaintiff access to facilities aligned with his gender identity likely violated the student's constitutional and statutory rights, and other students' privacy concerns were not sufficient to justify the policy's suspect classifications. *Id.* at 1052, 1055. While *Whitaker* dealt with access to bathrooms and not locker rooms, at least one other court in this district has extended the Seventh Circuit's rejection of privacy concerns in *Whittaker* to a rejection of privacy concerns as justification for excluding transgender students from gender-aligned locker rooms:

> Nothing in the Seventh Circuit's analysis [in *Whitaker*] suggests that restrooms and locker rooms should be treated differently under Title IX or that the presence of a transgendered student in either, especially given additional privacy protections like single stalls or privacy screens, implicates the constitutional privacy rights of others with whom such facilities are shared.

*Students & Parents for Priv. v. United States Dep't of Educ.*, No. 16-CV-4945, 2017 WL 6629520, at *5 (N.D. Ill. Dec. 29, 2017). Indeed, under controlling precedent in this Circuit, C.G.'s suggested alternative—excluding Student B and other transgender students like her from using facilities aligned with their gender identities—could itself violate the very constitutional amendment and statute she brings her claims under. *See A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 775 (7th Cir. 2023).[4]

---

[4] C.G. attempts to distinguish this case from *Whitaker* and *Martinsville* on the basis that those cases involved "persistent, medically supported . . . gender identities" of transgender students, and "no allegations that the accommodations they sought undermined other students' privacy in intimate spaces." (Opp'n [42] at 7.) The Seventh Circuit has explicitly rejected such an attempt to limit its holdings in *Whittaker* and *Martinsville* to their precise facts: "Our decisions in *Whitaker* and *Martinsville* did not turn on the plaintiffs' ages, hormone treatments, or medical

Plaintiffs next advance an argument that Title IX "affirmatively preserves" "sex-based protections," namely, "sex-based separation in intimate spaces." (Opp'n [42] at 6.) But this argument is unsupported by the statutory and regulatory language C.G. cites. Section 1686 states that "[n]othing contained [in this chapter] shall be construed to prohibit any educational institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C § 1686. This language states that institutions receiving federal funds that wish to maintain sex-segregated facilities will not be foreclosed from doing so under the terms of Title IX—it does not *require* maintenance of such facilities. Similarly, the Department of Education's implementing regulations state only that institutions "*may* provide separate toilet, locker room, and shower facilities on the basis of sex." 42 C.F.R. § 106.33 (emphasis added). "But 'may' is a permissive term, and permissive statutory or regulatory language, by definition, does not command anyone to do anything." *Sigler v. GEICO Cas. Co.*, 967 F.3d 658, 661 (7th Cir. 2020) (citing ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 112 (2012)).

The District's motion to dismiss C.G.'s Title IX claim is granted.

## II. First Amendment Retaliation

C.G. brings her First Amendment retaliation claim against Ford and Van Treese, alleging that these administrators retaliated against her for her protected speech (a) by threatening discipline for not changing and for 'misgendering' a transgender female student; (b) by allegedly "coercing" her to undress to her sports bra and underwear in the presence of adults and Student B; (c) by supervising the locker room on February 27, 2025; and (d) by proposing through Shepard's principal that C.G. switch to a different PE class. (Am. Compl. [37] ¶ 78.)

---

conditions." *D.P. by A.B. v. Mukwonago Area Sch. Dist.*, 140 F.4th 826, 833 (7th Cir. 2025), *reh'g granted and opinion vacated*, No. 23-2568, 2025 WL 1794428 (7th Cir. June 30, 2025), *appeal dismissed,* No. 23-2568. *Mukwonago* has been vacated in light of the Supreme Court's holding in *Skrmetti*, and is no longer controlling, and the Seventh Circuit has suggested that it may overrule *Whitaker* and *Martinsville,* the cases *Mukwonago* interpreted, as well. Until and unless that happens, however, *Whitaker* and *Martinsville* remain binding on this court.

To establish a First Amendment retaliation claim, C.G. must show (1) that she "engaged in protected First Amendment activity," (2) that she "suffered a deprivation because of that activity," and (3) "causation—that is, that the First Amendment activity was at least a motivating factor in the [Defendants'] decision to take the retaliatory action." *Minocqua Brewing Co. LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). For purposes of First Amendment retaliation, "an action is adverse," and therefore a deprivation of First Amendment rights, "if it is 'likely [to] deter a person of ordinary firmness from continuing to engage in protected activity.'" *E. D. v. Noblesville Sch. Dist.*, No. 1:21-CV-03075-SEB-TAB, 2024 WL 1140919, at *17 (S.D. Ind. Mar. 15, 2024) (quoting *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011)); *see Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020).

Defendants Ford and Van Treese appear to concede—at least for purposes of their motion to dismiss—that C.G.'s conduct constituted protected speech. (Ford and Van Treese Mot. [40] at 5.) Instead, they argue that the actions C.G. challenges do not amount to a deprivation of her First Amendment rights because Van Treese and Ford were "simply carrying out their duties to enforce school rules and teach good citizenship." (Ford and Van Treese Mot. [40] at 5.) Whatever duties they may have been carrying out has no bearing, however, on whether C.G. experienced an adverse action in response to her protected conduct; that question turns on whether Defendants' conduct, based on an objective standard, would deter First Amendment activity in the future—regardless of the officials' subjective intent. *Surita*, 665 F. 3d at 878. The deterrent effect of retaliation "need not be great in order to be actionable." *McKinley v. Schoenbeck*, 731 Fed. Appx. 511, 515 (7th Cir. 2018). In practice, courts have found actions such as benching an athlete, *Whalen v. MacKenzie*, 760 F. Supp. 3d 743, 753 (W.D. Wis. 2024); forcing a teenager to delete social media posts, *Cohoon v. Konrath*, 563 F. Supp. 3d 881, 889–90 (E.D. Wis. 2021); and even "failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights," *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 75 n.8 (1990), actionable forms of retaliation. C.G. alleges that school officials issued an "ultimatum" to C.G.'s

classmates that they must change in the locker room with Student B present, or face discipline. (Am. Compl. [37] ¶¶ 4, 36–37.) She further alleges that school officials, including the two individual Defendants here, stood watch on two separate occasions to ensure that the girls changed into their PE clothes while Student B was present. (*Id.* ¶¶ 5, 6, 38–39.) Such actions by school officials are sufficient to amount to adverse actions taken in response to protected speech.

Next the individual Defendants argue that C.G. has failed to allege retaliatory motive. Again, the court disagrees. "Although 'suspicious timing will rarely be sufficient in and of itself to create a triable issue,' if the employee's speech and the adverse employment action are very close in time, it may be probative of a causal link between the two events." *Sweet v. Town of Bargersville*, 18 F.4th 273, 279 (7th Cir. 2021) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). C.G. alleges that these actions were taken immediately in response to her protected activity. At the pleading stage, this allegation is sufficient to survive the motion to dismiss.

Finally, Ford and Van Treese argue that that their response to C.G.'s conduct was justified by the fact that "the protest caused a disruption in the academic program and effectively reduced the protesting girls' participation in class." (Reply [43] at 4). True, the First Amendment rights of students in schools must be "applied in light of the special characteristics of the school environment." *Tinker v. Des Moines Ind. Cmty. Sch. Dist.*, 393 U.S. 503, 506 (1969). And "[R]estrictions on student speech are constitutionally justified" where school officials "present 'facts [that] might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities' or the invasion of the rights of others." *N.J. by Jacob v. Sonnabend*, 37 F.4th 412, 426 (7th Cir. 2022) (quoting *Tinker*, 393 U.S. at 514.). But the "burden of justifying student-speech restrictions [falls] squarely on school officials." *Id.* at 426. These Defendants have not met that burden at this stage, where the complaint's allegations are construed in the light most favorable to Plaintiffs. Defendants point only to C.G.'s allegation that

changing only into gym shoes limited her participation in the PE class. (Am. Compl. [37] ¶ 3, 35.) The complaint provides no basis for an inference that C.G.'s limited participation in class constituted a substantial disruption or material interference with school activities, nor that her refusal to change invaded the rights of others.

Finally, Ford and Van Treese invoke the defense of qualified immunity, arguing that the rights implicated in C.G.'s First Amendment retaliation claim were not clearly established. "To clearly establish a right, '[t]he relevant precedent must define the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" *Hayes v. Bd. of Educ. of the City of Chicago*, 176 F.4th 994, 1003 (7th Cir. 2026) (quoting *Zorn v. Linton*, 607 U.S. 568, 146 S. Ct. 926, 930 (2026) (*per curiam*)). Once a defense of qualified immunity is raised, the plaintiff bears the burden of overcoming it. *See, e.g.*, *Leiser v. Kloth*, 933 F.3d 696, 701 (7th Cir. 2019). To meet that burden, Plaintiffs "must proffer precedent that places 'beyond debate'" the question of whether a public official's supervision and threat of discipline in response to a student's protest against school policies constitutes First Amendment retaliation. They have not done so. Plaintiffs' response to Defendants' invocation of qualified immunity centers around C.G.'s right to bodily privacy. But privacy rights have no bearing on the question of Defendants' liability for First Amendment retaliation. Because Plaintiffs points to no cases that show C.G.'s First Amendment rights were clearly established under these circumstances, the court finds Ford and Van Treese are entitled to qualified immunity.

C.G.'s First Amendment retaliation claim is dismissed.

With all federal law claims dismissed, the court relinquishes jurisdiction over C.G.'s remaining Illinois state tort claims. *See* 28 U.S.C § 1367(c)(3).

## **CONCLUSION**

Defendants' motions to dismiss [39,40] are granted without prejudice to filing an amended complaint within 28 days. Plaintiff's Motion for Class Certification is denied as moot [45].

ENTER:

Dated: September 9, 2026

REBECCA R. PALLMEYER
United States District Judge